**In re COLOCOTRONIS TANKER SECURITIES LITIGATION.**

**MDL No. 264 (CHT) and USDC MDL No. M–21–19.**

United States District Court, .S. D. New York.

March 27, 1978.

---

Pollack & Kaminsky, New York City by Daniel A. Pollack, Martin I. Kaminsky, Neil D. Thompson, New York City, for plaintiff American National Bank & Trust of New Jersey.

Lord, Day & Lord, New York City by Eugene F. Bannigan, Peter J. McKenna, New York City, for plaintiff United Virginia Bank.

Pepper, Hamilton & Scheetz, Philadelphia, Pa. by Barbara W. Mather, Alexander Kerr, Kenneth I. Levin, Philadelphia, Pa., for plaintiff The Fidelity Bank.

Saul, Ewing, Remick & Saul, Philadelphia, Pa. by Norman R. Bradley, Thomas J. Elliott, Philadelphia, Pa., for plaintiff First Pennsylvania Bank N. A.

Baker & Botts, Houston, Tex. by Alvin M. Owsley, Jr., Joseph Cialone, Houston, Tex., for plaintiff Texas Commerce Bank.

Gardere, Porter & DeHay, Dallas, Tex. by James A. Donohoe, Dallas, Tex., for plaintiff Republic National Bank of Dallas.

Sullivan & Cromwell, New York City by Philip L. Graham, Jr., Lista M. Cannon, New York City, for defendant European-American Banking Corp.

## MEMORANDUM

TENNEY, District Judge.

Pursuant to the direction of the Judicial Panel on Multi-District Litigation, *In re Colocotronis Tanker Securities Litigation*, Jud.Pan.Mult.Lit., 420 F.Supp. 998 (1976), this Court has been supervising pretrial proceedings in the six actions which make up this proceeding. During the concluding phase of document discovery, the primary defendant, European-American Banking Corporation ("EABC"), responded to certain of the plaintiffs' document requests by refusing to produce some 1,846 pages of documents, asserting the protection of the attorney-client privilege. The plaintiffs thereafter moved to compel production of these documents, arguing that the attorney-client privilege did not apply as against them and that certain documents were not within the protection of the privilege. For the reasons stated below, the Court concludes that EABC may assert the attorney-client privilege as against these plaintiffs. Decision is reserved, however, on the applicability of the privilege to certain documents, pending discussions between the parties and further briefing, if necessary, of the issues raised in the plaintiffs' reply papers.

At the center of this litigation is a series of transactions in which EABC entered into loans with the Colocotronis group of shipping companies and then established agreements whereby the various plaintiff banks took "participations" in these loans. The loans began in 1972; by late-1975 it became apparent that the financial condition of the Colocotronis group was deteriorating. Thus, in December 1975 there began the "workout," an attempt, which continues to this day, to salvage as much as possible from the loans. The workout was discussed in a series of meetings which began on December 16, 1975 and were attended by the participant banks. By May 1976 several of the banks had concluded that they had grounds for legal action against EABC; the first action was filed on May 7, 1976, and six more ultimately followed, one of which has been settled.

For the most part, the documents at issue on this motion either represent actual communications or reflect the substance of communications between officers of EABC and attorneys in three law firms: the British firm of Coward Chance and the American firms of Shearman & Sterling and Haight, Gardner, Poor & Havens ("Haight, Gardner").[1] It would appear from the affidavits submitted to the Court that these firms performed the following functions. (1) In 1972, Coward Chance was retained by EABC to review and advise EABC on "various loan and associated documents" and to make "arrangements for completion and execution of these documents." In the period 1972–75 the firm acted as counsel "to EABC on an ongoing basis in connection with the administration" of the Colocotronis loans. Coward Chance has also been involved in the workout. Affidavit of Keith Clark, sworn to March 2, 1978, ¶¶ 3–5. (2) Shearman & Sterling was retained in 1972 "to review certain Colocotronis loan agreements and in particular to advise EABC with regard to the applicability of New York law to the contemplated loans and to draft a basic participation agreement between EABC and participants in such loans." These services were rendered from 1972–75. Thereafter, Shearman & Sterling was also involved in the workout. Affidavit of Edward Hallam Tuck, sworn to March 3, 1978, ¶¶ 3–5 ("Tuck Affidavit"). (3) Haight, Gardner's involvement appears to have been oriented solely toward advising EABC during the workout; the firm was retained on December 10, 1975 "as special admiralty counsel by EABC to review EABC's loan agreements with certain ship-owning companies in the Colocotronis Group and in particular to advise EABC with regard to the possibility of foreclosing mortgages and taking other action to enforce EABC's rights in security which EABC held as collateral for the loans." Affidavit of Richard B. Barnett, sworn to March 3, 1978, ¶ 3 ("Barnett Affidavit").

### Attorney-Client Privilege

The plaintiffs base their challenge to EABC's assertion of the attorney-client privilege on two alternatively phrased theories. First, they argue that the participant banks must be regarded as actual "clients" of the three law firms and point to certain facts which allegedly give them this status. Second, they contend that even if they are not to be regarded as clients-in-fact, the structure of the loan participations and the relationship of the banks to EABC bring the participant banks within a special category of parties against whom it is improper to assert the attorney-client privilege. In this regard, they look particularly to those cases which have held that a corporation or corporate fiduciaries cannot assert the privilege against the shareholders or debenture holders of the corporation. The Court concludes that neither of these contentions will succeed under the facts of this case.

### Joint-Client Theory

■ The plaintiffs argue, quite properly, that if any attorney represents two parties with respect to a single matter, then communications with respect to that matter are not privileged from disclosure in a subsequent dispute between the two clients. The cases which rely on this rule depend, however, on a finding that the attorney in question actually *did* represent both clients simultaneously. For example, in *Simpson v. Motorists Mutual Insurance Company*, 494 F.2d 850, 855 (7th Cir.), *cert. denied*, 419 U.S. 901, 95 S.Ct. 184, 42 L.Ed.2d 147 (1974), the plaintiff was the assignee of all rights under an insurance policy. In a prior action

---

1. EABC also claimed a privilege with respect to communications with the British firm of Constant & Constant. EABC subsequently ascertained, however, that an attorney-client relationship with that firm lasted only from February 15, 1972, to approximately April 10, 1972. Memorandum in Opposition 4 n. *; Affidavit of Rainer Rustemeyer, sworn to March 3, 1978, ¶¶ 3–5. Accordingly, EABC disclaimed the protection of the privilege for documents outside that period. Memorandum in Opposition 4 n. *. Although only six such documents are listed in EABC's Memorandum, *id.*, the Court will consider this withdrawal of the assertion of the privilege to cover all such documents whether or not specified in the Memorandum. *E. g.*, # 1089–1090 (Letter dated 1/26/72); # 1411–1413 (Letter dated 4/16/73).

involving the policy, the assignor had been represented by the insurance company's attorney, which was now representing the defendant insurance company in the action by the assignee. There was no dispute that the attorney had actually represented the insured in the earlier trial, and the court held that the insurance company could not assert the privilege in the subsequent action. *Id.* at 855.

In the instant case, however, there is considerable reason to question whether the three firms ever "represented" the plaintiff banks. In contending that such representation existed, the plaintiffs point to several facts. First, they argue that certain attorneys from the firms attended the workout meetings commencing in December 1975 and continuing into the Spring of 1976; they point out that the attorneys were introduced at the first meeting as "our attorneys." Affidavit of Paul Poullard, sworn to March 1, 1978, at 3 ("Poullard Affidavit"). Second, they call attention to the fact that letters seeking reimbursement for the legal services rendered by the firms were sent by EABC to the participant banks and that these letters stated:

> The current situation with the Colocotronis Group has necessitated the use of special legal counsel, consultants and the employment of Peat, Marwick, Mitchell & Co. This was of the utmost importance to provide the Banks with legal advice and financial information to assist in the appraisal of the viability of the loans.

Letter of Rudolf P. Guenzel, Senior Vice President, EABC, to United Virginia Bank, dated April 12, 1976, appended as Exhibit B to Affidavit of W. Dennis West, sworn to February 28, 1978. Apparently only two of the six banks have reimbursed EABC for these expenses, however. Affidavit of Michael Rassmann, sworn to March 2, 1978, ¶ 6 ("Rassmann Affidavit").

■ The relevance of these alleged indicia of attorney-client relationship is limited in the first instance by the fact that they date solely from the workout period. No comparable facts from the period preceding December 16, 1975, have been cited to the Court, leading to the inescapable conclusion that before that time the firms in question represented EABC solely and exclusively. It is evident that EABC sought out the firms, engaged in continuous communication with them and paid them. The firms in turn advised EABC on the loans, which were solely between EABC and the Colocotronis group, and drafted the participating agreements with a view to embodying sufficient protection for the interests of EABC. Thus, no claim can be made that these firms were actually representing the participant banks in the pre-workout period, in which approximately five-sixths of the disputed documents were generated.

■ Similarly, an examination of the full context of the workout period leads this Court to conclude that no actual attorney-client relationship existed between the firms and the plaintiff banks in that period. Wigmore's classic definition of the attorney-client privilege has been accepted in this circuit. *See, e. g., United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961):

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 J. Wigmore, *Evidence* § 2292 (McNaughton rev. 1961) (original emphasis deleted). Thus, the privilege seeks to protect a relationship wherein legal advice is *sought* by a client who communicates *in confidence* for the purpose of obtaining such advice. The Court finds that the minimal relationship which may have existed between the plaintiff banks and the law firms did not have these characteristics.

There is no indication that any communications flowed between the banks and the firms except in several meetings held between December 1975 and May 1976. Moreover, several of the banks attended these meetings in the company of their own separate counsel. While the banks main-

**832**

tain that they "believed that [the firms] represented all of the participants in the European-American syndicates in connection with our efforts to resolve the problems mentioned above," Poullard Affidavit at 3, there is no indication that they entered into confidential communications with the firms or otherwise sought out their advice. Certainly the firms did not regard the banks as their clients. *E. g.*, Barnett Affidavit ¶¶ 3–10. Furthermore, of the statements on which the banks rely, the first— that the firms were represented by EABC to the participant banks as "our counsel"— is at least ambiguous and could easily have been intended to mean no more than "counsel for EABC." As discussed immediately above, there is no sign that this statement set off a period of confidential communication between the banks and the firms. Rather, all documents from the workout period, as from the previous period, represent or reflect communications between *EABC* and the firms. Finally, the fact that EABC billed the banks in a letter which stated that the firms were retained "to provide the Banks with legal advice," does not necessarily indicate that the banks were to be regarded as clients of the firms. EABC argues that these bills were submitted pursuant to Paragraph 5 of the standard loan participation agreement, which obligated the banks to reimburse EABC for "any and all costs, expenses and disbursements which may be incurred or made by [EABC] in connection with the Loan" for which EABC was not otherwise reimbursed. Rassmann Affidavit, Exh. A. The reference to "the Banks" can be taken to indicate no more than that EABC thought that the services of the firms in facilitating the workout of the loans would redound to the ultimate benefit of the participant banks.

In sum, the Court must look to the substance of the relationship which existed. In doing so, the Court concludes that the banks were not actual clients of the firms. Rather, the sole actual client was EABC, the entity which sought out the firms, which communicated with them in confidence and which looked to them for advice which would protect the interests of EABC.

In the absence of any comparable evidence which would demonstrate the existence of such a relationship of trust, confidence and mutual reliance between the banks and the firms, the few facts which the banks have put forward are insufficient to establish them as actual clients of these law firms.

*Beneficial Interest Theory*

The plaintiffs argue that even if they were not actual clients of the firms, their status as participants in the loans and the nature of their relationship to EABC, the lead bank in the loans, create a situation where assertion of the attorney-client privilege against them would be improper. In so arguing, they rely on a line of cases holding that the privilege could not be asserted by a corporation or a corporate fiduciary against the corporation's shareholders or debenture holders. In *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), the court of appeals held that corporate management could not assert an attorney-client privilege to protect communications between management and the attorneys for the corporation from disclosure to plaintiff shareholders who could demonstrate good cause for the disclosure. Looking to a test formulated by Wigmore, the court concluded that disclosure would be warranted if the "injury that would inure to the [attorney-client] relation by the disclosure of the communications" was outweighed by the "benefit thereby gained for the correct disposal of the litigation." *Id.* at 1100–04. The court analogized the case to the two-client situation discussed above, noting that "when all is said and done management is not managing for itself," *id.* at 1101, and remanded the case for factfinding on the issue of "good cause" for disclosure. *Id.* at 1104. On remand, the district court ordered disclosure, quoting the earlier conclusion of the district court that a "corporate entity acts only for its stockholders, and they are entitled to see written communications and to inquire concerning oral communications between their corporation and its attorneys." *Garner v. Wolfinbarger*, 56 F.R.D. 499, 504 (S.D.Ala.1972).

In the cases of *Valente v. Pepsico, Inc.*, 68 F.R.D. 361 (D.Del.1975), and *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211 (N.D.Ill.1972), the courts reached similar conclusions. In *Valente*, the court found that attorney communications with individuals who were board members of a corporation and like communications with a separate corporation which was also the majority shareholder of the corporation in question were not privileged from disclosure to the plaintiffs/minority shareholders. The court concluded:

[T]he decision of the Court is that where a fiduciary represents conflicting interests, particularly where one of those interests is its own, the only purpose to be served by the use of the privilege to withhold information from those to whom the fiduciary obligation runs is fraud. The more general and important right of those who look to fiduciaries to safeguard their interests, to be able to determine the proper functioning of the fiduciary, outweighs the need for the privilege and its base of attorney-client privilege.

68 F.R.D. at 370–71 n.16. Similarly, in *Bailey*, the court held that attorney communications with an individual who was an officer of one corporation and, at the same time, a director of a second corporation (ultimately purchased by the first) were not privileged from discovery by a shareholder and former chief executive officer of the second corporation, particularly where the communications concerned the acquisition of the second corporation. The court stated that the individual asserting the privilege "was under a continuing obligation to plaintiff as a shareholder . . . . As long as that duty existed, so did the concomitant interest of the [second company] shareholders in knowing [that individual's] legal communications concerning the future of their company." 55 F.R.D. at 214. Finally, in *Broad v. Rockwell Int'l Corp.* [1976–1977 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 95,894 (N.D.Tex.1977), the court held that a corporation "and the associated individual defendants may not assert attorney-client privilege against the debenture holders in this case, to whom they owed a fiduciary duty." *Id.* at 91,305.

Each of these cases has at its core one or more fiduciary relationships involving a corporation or its officers and directors and its shareholder or debenture holders. In each case, the court found that the strength of these corporate fiduciary relationships created interests in favor of disclosure which outweighed the interest in protecting the attorney-client relationship. The courts concluded that the assertion of this privilege by certain corporate fiduciaries against disclosure to individuals whom they exist to serve within the corporate structure was untenable. While this reasoning may be appropriate in the corporate situation, however, this Court declines to extend it to cover the kind of relationships which exist in the case at bar.

■ Here, the plaintiff banks entered into participation agreements with EABC in which rights and duties were clearly delineated and benefits clearly stated. *See* Rassmann Affidavit, Exh. A. The fact the EABC occupied a central position in these transactions and that EABC managed the loans whose profitability would inure to the benefit of the plaintiffs does not mean that these agreements established a special fiduciary or trust relationship. The indicia of such a situation are not present here. *See Stratford Financial Group v. Finex Corp.*, 367 F.2d 569 (2d Cir. 1966). Rather, these agreements are arms-length contracts between relatively sophisticated financial institutions and do not establish fiduciary relationships such as exist between the management of a corporation and the corporation's shareholders or even its debenture holders.[2]

---

**2.** The cases cited by the plaintiffs for the proposition that loan participation agreements create trust relationships are inapposite, for each is concerned not so much with the nature of the relationship between manager and participant as with the substantive rights of the loan participants with respect to funds received or paid out on the loans in the event of a failure by the manager or lead bank. *Todd v. Pettit*, 108 F.2d 139 (5th Cir. 1939) (certificate holders in oil syndicate entitled to priority over creditors of bankrupt manager of syndicates); *Cof-*

EABC is a major financial institution which routinely engages in loans and loan participations. *See* Tuck Affidavit ¶ 3. In doing so, it necessarily relies on the advice of counsel which it has sought out and with which it has communicated with an expectation of confidence. The ability to function of a bank, an institution which by its nature occupies a central position in the financial lives of all those with whom it does business, would be seriously impaired if it could not depend on the confidentiality of its communications with its attorneys. Under these circumstances, the Court concludes that the harm of disclosure outweighs the benefit to the litigation.

*Other Matters*

The plaintiffs raise certain other arguments, particularly in their reply papers, concerning the application of the privilege to the documents in question. Because EABC has not had an occasion to respond to the majority of these arguments, and because the Court believes that further discussion between counsel for EABC and counsel for the plaintiffs may resolve some of these issues, *see* Rule 9(f) of the General Rules of the United States District Court for the Southern District of New York, decision on issues not disposed of in this Memorandum is reserved until counsel advise the Court that any such issues remain unresolved following discussions and until EABC has had the opportunity to submit papers in response to the plaintiffs' arguments.

So ordered.

*fey v. Lawman,* 99 F.2d 245 (6th Cir. 1938) (holders of certificates of participation in mortgages entitled to priority over receiver in liquidation of bank which organized and managed loan participations). Thus, this Court concludes that an attorney-client privilege rule which speaks to the significance of corporate fiduciary relationships should not be further extended solely on the authority of law developed to settle questions of priority to funds in a bankruptcy or liquidation context.