**FIRST WISCONSIN MORTGAGE TRUST, a Massachusetts business trust, Plaintiff,**

v.

**FIRST WISCONSIN CORPORATION, a Wisconsin Corporation; et al., Defendants.**

Civ. A. No. 75-C-127.

United States District Court,
E. D. Wisconsin.

March 12, 1980.

L. C. Hammond, Jr., Quarles & Brady, Milwaukee, Wis., and Bernard J. Nussbaum and Harold C. Hirshman, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff.

H. Templeton Brown, Mayer, Brown & Platt, Chicago, Ill., for defendants.

REYNOLDS, District Judge.

This action was before the court on two discovery matters raised by the plaintiff relating to the production of documents by the defendants and by the Foley & Lardner ("Foley") law firm. Plaintiff sought enforcement of a subpoena duces tecum served on Foley on October 10, 1979, to which Foley opposed a claim of work product, and plaintiff sought access to 126 documents withheld by the defendants on a claim of attorney-client privilege. Oral argument on the requests was held on December 28, 1979, plaintiff appearing by Harold Hirshman and Fruman Jacobsen, defendants by Kenneth Jurek, and Foley & Lardner by Robert DuPuy, at which time the Court denied the requests and stated the reasons would be filed later. This memorandum constitutes the reasons for the decision.

The interrelationship of the parties and of counsel in this action is relevant to reso-

lution of the discovery requests, and, therefore, a brief history is set forth. The plaintiff First Wisconsin Mortgage Trust ("Trust") was established in 1971 under the sponsorship of the defendant First Wisconsin Corporation ("FWC"). It was advised on its investments by the defendant First Wisconsin Mortgage Company ("FWMC"), a wholly-owned subsidiary of FWC, and was jointly involved in various loan transactions with the defendant First Wisconsin National Bank ("FWNB"), also a subsidiary of FWC. Through March 12, 1975, when this action was commenced, the Trust had few independent officers or employees. After that date, all of its officers and employees who were also officers or employees of the defendants resigned with the exception of the Trust's president, Roger Fitzsimonds, and its vice president and secretary, Louis Giese, both of whom were also officers of one or more of the defendants. Those two men retained their positions with the Trust until April 1, 1979, at its request, and with its knowledge that they also retained their positions with the defendants. They resigned effective that date due to the defendants' intention to use them in preparation of this case for trial.

From 1971 through February 1974, the Trust and the defendants were all represented by the Foley law firm. In February 1974, the Trust retained the firm of Sonnenschein, Carlin, Nath & Rosenthal ("Sonnenschein") as special counsel to advise it in all matters relating to troubled loans, and by April 1974, Sonnenschein also had commenced representation of the Trust in connection with its claims against the defendants. Foley continued to represent the defendants as general counsel and in connection with this litigation. On November 15, 1976, this Court ordered Foley disqualified as counsel for the defendants in this litigation. *First Wisconsin Mortgage Trust v. First Wisconsin Corporation*, 422 F.Supp. 493 (E.D.Wis.1976). Mayer, Brown & Platt ("Mayer") filed a notice of appearance for the defendants on December 15, 1976. On June 14, 1977, the Court denied Mayer's motion for access to Foley's work product. *First Wisconsin Mortgage Trust v. First Wisconsin Corporation*, 74 F.R.D. 625 (E.D. Wis.1977). That order was affirmed by the court of appeals on September 22, 1978, *First Wisconsin Mortgage Trust v. First Wisconsin Corporation*, 571 F.2d 390 (7th Cir. 1978), but reversed on rehearing en banc 584 F.2d 201 (7th Cir. 1978).

Foley continues to act as general counsel for the defendants. It has turned over to Mayer more than 150,000 documents from its files, many of which have in turn been given to the plaintiff. Foley has also withheld some documents from Mayer.[1] Of plaintiff's discovery requests now before the court, the first relates to documents which Mayer has not requested from Foley and which Foley has not produced to Mayer, and the second relates to documents which Foley has turned over to Mayer but which Mayer declines to show to the plaintiff.

## THE PLAINTIFF'S REQUEST FOR FOLEY'S WORK PRODUCT WHICH HAS NOT BEEN PRODUCED TO MAYER

On October 10, 1979, the Trust served on Foley a subpoena which directed Foley to bring with it to a deposition and to produce:

" * * * all notes, memoranda, reports, summaries and any other writings—formal or informal—in the possession, custody or control of Foley & Lardner, that relate to interviews, investigations, discussions, or conferences conducted by, or in the presence of, any attorney or employee of Foley & Lardner, or any co-counsel, of any actual or potential witness, expert, consultant, or participant in any work-out or litigation concerning a loan in which the First Wisconsin Mortgage Trust ("Trust") was, or had been, a participating, sole or lead lender and wherein Foley & Lardner (or its co-counsel) represented any or all of the First Wisconsin Corporation, the First Wisconsin National Bank of Milwaukee, the First Wisconsin Mortgage Company, or the Trust."

---

1. Mayer makes no request for these documents in these proceedings.

The factual information before the court is limited and not always clear, but from the briefs and exhibits filed by the parties and the representations made by counsel during the oral argument, the situation appears to be as follows:

(1) As to the nature of the documents requested, despite the breadth of language in the document request as set forth in the subpoena, it appears from the briefs and the affidavit of Robert DuPuy of Foley, filed with respect to this motion, that the documents at issue consist solely of memoranda written by members of the Foley law firm following interviews conducted by them of witnesses in potential litigation arising out of approximately forty loans for which the defendant FWNB was the lead lender and the plaintiff was a participating lender.[2] (DuPuy affidavit, filed December 11, 1979, paragraphs 3, 4, and 7.) The Du-Puy affidavit states in paragraph 7 that Foley has no witness statements per se; rather it has "notes prepared by Foley & Lardner attorneys of conversations with 'potential' witnesses, in most instances officers or former officers of the Bank or Mortgage Company." The notes have not been turned over to Mayer, defendants' counsel in this litigation. Plaintiff has offered to limit its request by permitting Foley to excise "any attorney's opinions, mental impressions or legal conclusions contained in these witness statements." (Plaintiff's brief, filed November 26, 1979, at 2.)

(2) As to the time frame, Foley has agreed to produce all of its files, including notes of potential witnesses made prior to February 1974 when the Trust retained Sonnenschein. Plaintiff seeks all notes made after that time through the present date.[3]

(3) Foley asserts that plaintiff has already scheduled depositions of many of the persons whose statements are at issue.

(DuPuy affidavit, paragraph 9—final exhibit to Foley's brief filed December 11, 1979.) Plaintiff claims not to know the identity of the witnesses, when their statements were taken, or how many witnesses are involved, but it also states that its scheduled depositions will not exhaust even the FWNB employees who have knowledge of the loans, and that many witnesses already deposed have been unable to recall the loan transactions. Plaintiff also alleges that many of the witnesses are employees of the defendants who may be hostile to plaintiff and therefore uncommunicative about the loans.

(4) Procedurally, plaintiff has not served interrogatories on Foley[4] or on the defendants in an effort to learn the identity of witnesses who were interviewed by Foley attorneys. It claims to have made an informal request of Foley that it be provided with a list of names and of dates of interviews in order to make a detailed showing of need for Foley's work product. Foley disputes that such a request has been made. Plaintiff also claims to have been advised by the defendants that they cannot provide such a list, having never seen Foley's notes, and, furthermore, that they have no interest in viewing the notes themselves and therefore will not request them from Foley; and defendants take the position that they have no right of access to Foley's files generated as general counsel for the defendants with the exception of any original documents contained in Foley's files but belonging to the defendants.

The Trust claims (A) that Foley has no standing to contest the Trust's subpoena; (B) that the witness notes are work product but that plaintiff has met its burden for their discovery under Rule 26(b)(3) of the Federal Rules of Civil Procedure; (C) that Foley was at the relevant times plaintiff's attorney and therefore, plaintiff is entitled to the notes; and (D) that pursuant to

---

**2.** On loans for which the Trust was the lead lender, Foley has produced its files without deletion of documents.

**3.** All of the loans involved were made in 1971–1973, but apparently borrower litigation over the loans continues through the present.

**4.** Plaintiff states that it cannot under the Federal Rules of Civil Procedure serve interrogatories on Foley. That question is not one the Court need presently decide.

paragraph 8 of a loan participation agreement entered into in November 1972 between FWNB and the Trust, plaintiff has a contractual right to see the notes. (Exhibit D to plaintiff's brief, filed November 26, 1979.)

### (A) *Foley's Standing*

 Rule 26(b)(3) of the Federal Rules of Civil Procedure provides in part:

"Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, * * *) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. * * *"

Plaintiff argues that the attorneys' notes of witnesses' statements were not prepared in anticipation of this litigation, that Foley does not represent the defendants in this litigation, and, therefore, that Foley has no standing to object to the production of the notes for use in this litigation.[5] Foley on the other hand argues that the attorneys' notes were prepared "in anticipation of litigation," even though not for use in this case, and that Foley is a representative of the defendants, even though not in this case. Both sides concede that there is no persuasive authority on the standing issue.

When this litigation was commenced, Foley was the defendants' sole representative. It continues to represent the defendants as their general counsel and in their legal affairs not related to this suit. The attorneys' notes were prepared by Foley as defendants' representative in anticipation of litigation brought by borrowers against FWNB. The subpoena is addressed to it and seeks documents in its sole possession.

The scope of Rule 26(b)(3) is not limited to lawyer work product prepared for use in the particular litigation in which discovery is sought. 4 Moore's Federal Practice ¶ 26.63(2.—1), at 26–349; *Duplan Corporation v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973). Thus, the notes themselves fall within the scope of Rule 26, and the Court is of the opinion that Foley, as the defendants' general counsel, as the law firm which prepared the notes on behalf of defendants, and as the party to whom the subpoena is addressed, has standing to contest the production of the notes.

### (B) *Plaintiff's Burden of Proof*

"* * * Where an attorney personally prepares a memorandum of an interview of a witness with an eye toward litigation such memorandum qualifies as work product even though the lawyer functioned primarily as an investigator. * * *" *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 492 (7th Cir. 1970), aff'd per curiam by an equally divided court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), cert. denied 401 U.S. 950, 91 S.Ct. 917, 28 L.Ed.2d 234 (1971). In *Hickman v. Taylor*, 329 U.S. 495, 512–513, 67 S.Ct. 385, 394, 91 L.Ed. 451 (1947), in discussing the production of witness statements prepared by an attorney, the Court stated:

"* * * the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order. * * *

* * * * * *

"* * * Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives

---

**5.** Defendants' counsel in this litigation, Mayer, Brown & Platt, has notified the court and the plaintiff that if Foley lacks standing to contest production, it intends to contest production of the notes.

rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standards of the profession would thereby suffer."

Plaintiff argues that its burden is satisfied in this case because the passage of time is likely to have impaired the memory of many of the witnesses, because many of the witnesses as employees of the defendants are likely to be hostile to the plaintiff and because of the great expense and delay which will result if it is forced to depose all of the witnesses. It relies as authority upon *Harper & Row Publishers, Inc. v. Decker*, supra, and *Southern Railway Company v. Lanham*, 403 F.2d 119 (5th Cir. 1968), rehearing denied 408 F.2d 348 (5th Cir. 1969).

■ First, the Court notes that the factual information before it is too scanty, and for that reason alone plaintiff has failed to meet its burden. The Court does not know the number of witnesses involved, how long ago the witness statements were taken, whether the particular witnesses will claim impaired memory, how many of them are employees of defendants, and how long the conduct of the depositions would take.

Secondly, the cases which plaintiff cites do not support its claim for liberal discovery. *Southern Railway Company v. Lanham*, supra, discusses the lesser standards applicable for discovery of witness statements taken not by an attorney but by a claim agent for an insurance company. And in *Harper & Row Publishers, Inc. v. Decker*, supra, which was a mandamus action to vacate a district court's order compelling production, the court of appeals, while it noted that the less a lawyer's "mental processes" are involved in preparing a statement the less good cause need be

shown by his adversary to obtain production, 423 F.2d at 492, did not discuss in detail the standards for showing good cause but instead held merely that "[w]e conclude, however, that lack of good cause has not been made to appear sufficiently for issuance of a writ of mandamus." 423 F.2d at 492. The Court did note that findings as to each individual witness whose statement is sought are preferable to a generalized showing of need for the statements en masse. The case of *Hauger v. Chicago, Rock Island & Pacific Railroad Company*, 216 F.2d 501 (7th Cir. 1954), is more on point, and it does not support plaintiff's position. The Court there, quoting *Alltmont v. United States*, 177 F.2d 971, 978 (3d Cir. 1950), discussed the showing of good cause as follows:

" 'In other words he must show that there are special circumstances in his particular case which make it essential to the preparation of his case and in the interest of justice that the statements be produced for his inspection or copying. His counsel's natural desire to learn the details of his adversary's preparation for trial, to take advantage of his adversary's industry in seeking out and interviewing prospective witnesses, to help prepare himself to examine witnesses or to make sure that he has overlooked nothing are certainly not such special circumstances since they are present in every case.' " 216 F.2d, at 506.

The Court concluded at 508:

"The situation surrounding the six statements of witnesses, now under consideration, is no different from that existing in the ordinary case where one litigant, in the course of preparation for trial, has secured statements of witnesses which the opposing party's lawyer would like to read. Even though that lawyer hopes or believes, based upon guess, conjecture or suspicion, that a reading of the statements would reveal a basis for impeachment, or give him other valuable information, it has never been the practice of courts generally to require the production of such statements under such

circumstances. The courts have traditionally left a lawyer to his own industry aided by the use of depositions, interrogatories and subpoenas. A court is not justified in ordering a litigant to permit his adversary to inspect witness statements, which he has procured in preparing for trial, upon the adversary's mere surmise or suspicion that he might find impeaching material in the statements. In such a situation the rights of a litigant in the work-product of his lawyers and agents are not required to give way to an adversary's right of discovery. *Hickman v. Taylor*, and *Alltmont v. United States*, supra. A construction at this time extending the scope of Rule 34 [the then relevant provision of the Federal Rules of Civil Procedure] to cover such a situation, which is commonplace in thousands of pending cases, both at law and equity, would be not only unjustified by the provisions of that rule but would also be a startling innovation, which, in no small measure, would revolutionize the practice of law in the federal courts. In the absence of language in Rule 34 clearly indicating such a drastic change in the settled methods of the practice of the law, we are unwilling to startle the members of the bar by the announcement of the interpretation suggested by plaintiff."

At least on the showing made to date in this case by the plaintiff, there also exist no special circumstances justifying production of the documents sought.

The Court recognizes the difficulties that the Trust has faced in trying to get the information required to enable it to make a detailed showing of need for the witness notes, but plaintiff's efforts are not documented in the record, and in view of *Harper & Row Publishers, Inc. v. Decker*, supra, and *Hauger v. Chicago, Rock Island & Pacific Railroad Company*, supra, the Court is not persuaded that plaintiff has made sufficient preliminary efforts to obtain the information, which efforts, if unsuccessful, might then justify the Court's requiring a lesser showing of need.

■ Finally, the Trust asserts that Foley was not working against it in preparing the notes of witnesses' statements because they were made in the face of suits brought or threatened by borrowers against the Trust and FWNB jointly, and that the lack of an adversarial relationship between the Trust and FWNB sets this case apart from the ordinary work product case. The work product doctrine, however, is designed for the protection of the lawyer and the standards of the legal profession, as well as for the protection of the adversary process. *Hickman v. Taylor*, supra, 329 U.S. at 513, 67 S.Ct. at 394. Therefore, Foley has some interest at least in the privacy of its own work product, independent of its client's position with respect to the Trust at the time the notes were created. Furthermore, as discussed in the following section, despite their potential status as joint defendants, the Court is persuaded that FWNB and the Trust were in significant ways acting in an adversarial manner in the workout of troubled loans.

### (C) *Foley as Plaintiff's Attorney*

■ Pursuant to a loan agreement entered into in November 1972 between FWNB and the Trust governing loans in which both entities were participatory lenders, the Trust agreed to pay a share of Foley's fees for the preparation of loan workouts and of defenses against borrower suits. The arrangement continued after the Sonnenschein firm was retained as counsel for the Trust, and Foley continued to perform the legal work necessary to the loan workouts and litigation arising out of loans for which both the Trust and the Bank were lenders. The Trust argues that Foley was therefore its attorney for the purposes covered by the agreement and that the Trust is entitled to see documents prepared by Foley pursuant to its obligations under the agreement.

The Court in *In re Colocotronis Tanker Securities Litigation*, 449 F.Supp. 828 (S.D. N.Y.1978), was presented with a similar situation and found that the attorney for one of the entities who did most of the legal

work for both entities pursuant to a loan participation agreement did not have an attorney-client relationship with the participatory lender. The Court stated that it must look to the substance of the relationship existing between the entities and the attorney, and it discounted the payment of fees as a significant factor, stating that the payment did no more than indicate that the attorney's work in facilitating the loans accrued to the ultimate benefit of the participatory lender. The Court looked instead at whether or not there existed "such a relationship of trust, confidence and mutual reliance" as to establish the participatory lender as a client of the attorney, 449 F.Supp. at 832, and found that no such relationship existed. See also 8 Wigmore, Evidence § 2292.

Plaintiff points out that the Court in *Colocotronis* found the financial institutions there involved to be independent entities operating at arms length, and found that the attorney whose work product was at issue was hired by the lead lender as special counsel solely to advise it on the loans, whereas the Trust and the defendants in this case were not operating at arms length, and Foley was general counsel for both the plaintiff and FWNB for a significant period of time after the loan participation contract was created. Foley points out that all of the notes of witnesses' statements which it has withheld were generated during the period of time after Foley ceased to act as general counsel for the Trust, and that the Trust was then represented by and did in fact consult with Sonnenschein before taking any significant action with regard to any loan.

Once again, the Court is hampered by the lack of documented factual information in the record before it. Considering the relationship now existing between the Trust and FWNB, however, and considering also the type of advice given by Foley to FWNB with regard to loan workouts as revealed in some of the privileged documents which are the subject of plaintiff's second discovery request, it does not appear that a "relationship of trust, confidence and mutual reliance" existed between the Trust and Foley

after the retention of the Sonnenschein firm as general counsel for the Trust. Despite their position as potential joint defendants, on the present record the Court is persuaded that the Trust and FWNB were at the relevant times dealing with each other at arms length in regard to resolution of the loan workouts, and that Foley was not acting as the Trust's attorney.

(D) *The Loan Participation Agreement*

Paragraph 8 of the November 1972 loan participation agreement between the Trust and FWNB provides:

"8. Bank shall permit Participant [the Trust] to examine its files, books, records and accounts relating to the Loan, and security therefor and all other matters connected with the Loan, and will, upon the request of Participant, furnish to Participant such information requested as it may have with respect to the matters connected with the Loan." (Exhibit D to plaintiff's brief, filed November 26, 1979.)

Plaintiff's position is that this provision entitles it to see all of the notes of witness statements which Foley prepared because they concern "other matters connected with the Loan[s]," i. e., subsequent litigation arising out of the loans.

An individual may not make documents confidential by turning them over to his attorney for safekeeping. *Balistrieri v. O'Farrell*, 57 F.R.D. 567 (E.D.Wis.1972). A lawyer's interest in the confidentiality of his own work product, however, is in itself protectible. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The court has been presented with no authority for the proposition that a lawyer must turn over even to his own client all of his work product on the client's case, no less to turn such material over to a third party who has a contractual right to see the client's files.

Were this a case where Foley had withheld documents which it otherwise would have provided to its client, FWNB, in order to prevent FWNB from then having to reveal the documents to the Trust under paragraph 8 of the Trust's and FWNB's

agreement, the Court would not permit FWNB to avoid its contractual duty by means of such a subterfuge. As far as appears in the present record, however, the documents were prepared by Foley for its own use in representing its client, FWNB, and were never intended to be shown to officers or employees of FWNB or to become FWNB's records. As previously stated, there is no documentation of a request from the Trust to FWNB, Foley, or Mayer for the witness statements or for a list of witnesses and of dates of interviews. Therefore, the issues of whether FWNB could get the notes from Foley if it chose to ask for them, if so whether it should be compelled to ask for them, and whether the Trust could in turn get them from FWNB are not properly before the court.

## THE ATTORNEY–CLIENT PRIVILEGE—DOCUMENTS WHICH FOLEY HAS PRODUCED TO MAYER

In the course of its review of documents turned over to it by Foley pursuant to the en banc holding of the court of appeals in *First Wisconsin Mortgage Trust v. First Wisconsin Corporation*, 584 F.2d 201 (7th Cir. 1978), Mayer has in turn produced to the plaintiff in excess of 150,000 pages of documents from Foley's files. Mayer withheld 158 documents which it claimed are privileged from disclosure to plaintiff because of the attorney-client privilege. Twenty-one of the documents were inadvertently revealed to plaintiff. Then the remaining 137 documents were submitted to this court for in camera review on October 5, 1979, and since then, defendants inadvertently turned over 11 more of these documents to plaintiff. During the deposition by plaintiff of David Shute, a Foley attorney, in December 1979, he was questioned by plaintiff's counsel about the 21 documents originally inadvertently turned over to plaintiff. The defendants' present position is that the production of these two sets of documents—the 11 turned over to the plaintiff after the submission of the documents for in camera review and the 21 turned over prior to that time—was inadvertent.

With regard to the 126 documents not yet produced, the plaintiff argues that no attorney-client privilege exists with respect to (1) documents generated during the time when Foley was general counsel to the Trust; (2) documents addressed to, authorized by, or received by persons who were at that time officers or trustees of the Trust; (3) documents generated by Foley and giving legal advice about this litigation after Foley's disqualification by this court on November 16, 1976; (4) documents generated by Foley during the time when it was disqualified ab initio, after the complaint was filed in March 1975 but before November 16, 1976; (5) documents in which all persons receiving or sending the documents are nonlawyer employees of one or more of the defendants; and (6) documents where author, recipient, and other information necessary to demonstrate privilege is not provided. Plaintiff also argues that any claim of privilege which defendants might have had was waived by the production of the two sets of documents and the failure to object at Mr. Shute's deposition to questions about the documents as to any of the nondisclosed documents which are on the same subject matter as those already disclosed.

In *First Wisconsin Mortgage Trust v. First Wisconsin Corporation,* supra, the court of appeals found:

" * * * The work product came into being for the benefit of the defendants. It may be safely assumed that the work was not performed gratuitously by Foley but rather on a compensated fee basis. There is no challenge to the defendants' assertion that the preparation of the loan file summaries was not aided by any confidential information acquired by the Foley lawyers through their prior relationship with Trust. Indeed, it appears that the summaries are no different than they would have been if made in their entirety by lawyers who were strangers to all of the parties." 584 F.2d at 204.

It held:

" * * * Attorneys who reasonably and in good faith resist the challenge of disqualification, and who perform work during the interim period in which the

correctness of the disqualification motion is being determined, which work derives no advantage from the fact of prior representation, should not in effect be enjoined from that work by the mere filing of the motion. Unfortunately the practical effect might well be to impose a moratorium upon trial preparation for such period of time as it might take to rule upon a motion for disqualification." 584 F.2d at 205.

The Court ordered:

"Being of the opinion that the district court applied an incorrect rule of law in determining the present issue, we reverse the district court's order. Noting further, however, that in the particular case before us there has been no indication that any improper advantage has been secured, such as the use of confidential information, that the ruling of the district court would have been in any event an abuse of discretion, and that the underlying litigation has been already substantially delayed, we remand with direction to grant the motion of the defendants to turn over the work product in question to the substitute counsel. The order shall include permission for the former counsel to make such explication of the work product to the substitute counsel as to effectuate reasonably the turnover." 584 F.2d at 211.

Footnote 5 of the court's opinion at 211 notes:

"5. We regard the proposal of Trust during this litigation that the work product be also turned over to it as being merely a variation of a sanction against the client and decline to consider such treatment appropriate in this case."

Bearing in mind the decision of the court of appeals, which is the law of this case with respect to discovery of information in Foley's files, the points raised by the Trust will be taken up one at a time below.

*Existence of the Privilege*

(1) Documents generated during the time when Foley was general counsel to the Trust.

■ This category encompasses all documents generated by Foley up to September 1974 when it ceased to act as general counsel for the Trust. With regard to documents prepared in reference to this litigation, the court of appeals has already determined that the defendants have secured no improper advantage through their representation by Foley because Foley did not use confidential information gained through its position with the Trust in preparing work for the defendants. 584 F.2d at 211. Therefore, Foley's joint representation of the plaintiff and the defendants during the relevant period does not under the circumstances of this case destroy the defendants' right to assert the attorney-client privilege in order to insure the confidentiality of the documents, and an order requiring their production to plaintiff would be an impermissible sanction against the defendants. 584 F.2d at 211, n. 5.

There are no documents in this category generated prior to February 1974 when Sonnenschein began to represent the Trust in regard to troubled loans. The Court has already determined, in ruling on plaintiff's first discovery claim, that the record supports the defendants' contention that after February 1974, Foley was not acting as plaintiff's counsel with regard to the troubled loans. Again, therefore, defendants may assert the attorney-client privilege to protect the documents from disclosure.

(2) Documents addressed to, authorized by, or received by persons who were at that time officers or trustees of the Trust.

■ The documents in this category are separable by date into those which were generated after March 12, 1975, when the complaint was filed in this case, and those generated before that date. With respect to the first type, the Court has dealt before with the problems presented by the fact that officers of the defendants were also officers of the Trust. In a decision and order issued June 4, 1979, denying plaintiff's motion for a protective order prohibiting two such officers, Roger Fitzsimonds

and Louis Giese, from assisting the defendants in preparing for trial, the Court stated:

> "* * * it is clear that prior to March 12, 1975, the Trust had few independent officials or employees and that after that date, all other officials who also had positions with the defendants resigned, and Fitzsimonds and Giese remained in their positions at the Trust at its request and with its full knowledge that they also retained their positions with the defendants. * * *" (Decision and order at 6.)

These men were cast in dual roles with the consent of both sides to this litigation. Further, the documents in question were received by these persons in their capacity as officers of a defendant corporation. Thus, their receipt of the memoranda does not constitute waiver.

██ A more difficult question is presented by the documents generated before this litigation was commenced, of which there are 36 in total and 30 which plaintiff has not seen.[6] The commencement of litigation is a specific indication of the existence of a conflict of interest for officers serving both parties to the litigation, and in this case it caused a re-evaluation by the parties, which is reflected in the record, of the role of joint officers. The record is less clear as to the manner in which the parties viewed the role of joint officers before March 12, 1975.

The Court is persuaded, however, that after the retention by the Trust of the Sonnenschein firm in February 1974, with respect to advice given by Foley about this litigation, it was acting as counsel for the defendants only, and therefore its advice to defendants on that subject is privileged

from disclosure. See *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 368 (D.Del.1975).

With respect to advice given by Foley about troubled loans, while Foley did not resign as general counsel to the Trust until September 1974, the Court has found in the first part of this decision that Foley was not acting as the Trust's counsel in loan workouts after February 1974. Further, despite the dual fiduciary obligations of certain of the defendants' officers who also served as officers or trustees of the Trust, *Valente v. Pepsico, Inc.*, supra, the Court is of the opinion that after February 1974, they were kept at a distance in some degree by the plaintiff and did not have access to confidential information as officers of the plaintiff as to subjects over which plaintiff was then in dispute with the defendants. See the affidavits of Giese and Fitzsimonds filed April 23, 1979, in connection with plaintiff's earlier motion for a protective order, decided June 4, 1979. Consequently, the Court is satisfied that they were not under an obligation to turn over to the plaintiff confidential information which they received as officers of the defendants, and that defendants' present right to assert the attorney-client privilege with regard to that information is not waived as a result of the officers' past service in dual capacities.

(3) Documents generated by Foley and giving legal advice about this litigation after Foley's disqualification by this court on November 16, 1976.

The Court has examined all the documents submitted to it in camera, and there are none in this category.[7]

---

**6.** The 36 documents as listed in defendants' list of privileged documents filed October 5, 1979, are, in defendants' first category, documents 12 and 15; in the second category, documents 1, 2, 5, 6, 7, 9, 13, 16, 20, 31, 33, 45, 46, 49, 52, 53, 58, 59, 61, 63, 65, 66, 67, 68, 75, and 76; and in the third category, documents 2, 5, 11, 13, 18, 19, 23, and 27. All of the documents were written between February 1974 and March 11, 1975, with the exception of one—document 53 in defendants' second category—which was written in July 1972. That document and five

others—documents 2, 61, and 67 in defendants' second category, and documents 11 and 27 in defendants' third category—are among the 11 documents submitted to the court in camera which were subsequently produced to the plaintiff.

**7.** Document 8 in defendants' first category of documents in the list filed October 5, 1979, is misdated in the list as October 28, 1979. In fact the document is dated October 28, 1975.

(4) Documents generated by Foley during the time when it was disqualified ab initio after the complaint was filed in March 1975 but before November 16, 1976.

▉ Plaintiff's position as to this category of documents is without merit in view of the court of appeals' decision in *First Wisconsin Mortgage Trust v. First Wisconsin Corporation*, supra, at 205 and 211, in regard to documents generated in connection with this litigation. Foley has never been disqualified from continuing to act as the defendants' general counsel and from assisting the defendants in the workout of troubled loans.

(5) Documents in which all persons receiving or sending the documents are nonlawyer employees of one or more of the defendants.

▉ The rule protecting confidential communications between attorneys and clients does not necessarily extend to documents created by and belonging to the client but in the possession of the attorney. In *Fisher v. United States*, 425 U.S. 391, 403–404, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976), the Court stated:

" * * * This Court and the lower courts have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice. * * * "

In the instant case, however, the documents in question are not "pre-existing documents" but rather are communications among the officers of the defendant corporations created in response to requests from

Foley for information.[8] Realistically a large corporation could hardly assist in its own defense without this kind of communication, and if the privilege as applied to corporations is to mean anything, such documents must be protected. See *Radiant Burners, Inc. v. American Gas Association*, 320 F.2d 314, 324 (7th Cir. 1963):

"A corporation is entitled to the same treatment as any other 'client'—no more and no less. If it seeks legal advice from an attorney, and in that relationship confidentially communicates information relating to the advice sought, it may protect itself from disclosure, absent its waiver thereof."

(6) Documents where author, recipient, and other information necessary to demonstrate privilege is not provided.

▉ Perhaps the defendants should have been more specific in describing certain of the documents on their list filed October 5, 1979; for example, documents 2, 11, 14, and 17 in their first category. As previously stated, however, the Court has reviewed all the documents and has determined that the attorney-client privilege protects them all from disclosure. The plaintiff's interests are sufficiently protected by the submission of the documents to the court in camera and its review of the documents.

## Waiver of the Privilege

The plaintiff takes the position that because of their production to it of 11 documents previously submitted to the Court for in camera review and 21 documents about which Mr. Shute was questioned during his deposition in December 1979, the defendants have waived their attorney-client priv-

8. For example, DP00330 (part of defendants' document 15 in their first category on the list filed October 5, 1979) is a request for certain information, directed from a Foley attorney to bank officers. DP00256–DP00267 (part of defendants' document 12 in their first category on the list filed October 5, 1979) are responses to that request, but directed from loan officers to the corporation officials who originally received the request from Foley.

The Court has examined all of the ten documents in this group—documents 3, 4, 5, 6, 7, 18, and 19 in defendants' first category; documents 51 and 62 in defendants' second category; and document 4 in defendants' third category—and they were all generated in a similar manner.

ilege with respect to any of the documents submitted to the court for in camera review which relate to the same subject matter as the disclosed documents. The defendants take the position that their production of any privileged documents was inadvertent and should constitute waiver of the privilege as to those documents only. (See the December 21, 1979, letter of attorney H. Templeton Brown.)

The Court has reviewed the portion submitted to it of the transcript of Mr. Shute's deposition taken on December 3, 1979, and finds no clear evidence of an intentional waiver of the attorney-client privilege by the defendants. See in particular the transcript at 145–150, 165–166, 197. With regard to two documents in plaintiff's possession, defendants claimed specifically that they were inadvertently produced and requested Mr. Shute's attorney to instruct him not to answer any questions about the documents. (Tr. at 145–146) With regard to the other documents, no specific statement on inadvertent or intentional production was made, but Mr. Shute's attorney instructed him to answer questions about the documents themselves and not to answer general questions about the subject matter to which they related:

"MR. HIRSHMAN [plaintiff's attorney]: Mr. DuPuy [Mr. Shute's attorney], is it my understanding that you are now instructing the witness, on the basis of Mr. Honkisz' [defendants' attorney] earlier statement?

"MR. DU PUY: This particular instruction?

"MR. HIRSHMAN: Yes.

"MR. DU PUY: That is correct, Mr. Hirshman.

"MR. HIRSHMAN: You are doing that without Mr. Honkisz having raised any objection to the question and without Mr. Honkisz having asserted that the document itself is privileged, is that correct?

"MR. DU PUY: It is my understanding that the document has been produced, and that any claim of privilege by the Defendants with respect to this document has been waived, and to the extent that your questions relate to the document in the origination and the preparation of the document, I am prepared to allow the witness to answer, but it is also my understanding that the Defendants are not waiving any conversations or investigations, which this witness or any other witness of Foley & Lardner may have conducted with respect to any claim which the trust may make, or could make against the Defendants in this litigation, which may have been conducted subsequent to March of 1974." (Tr. at 165–166)

Defendants subsequently have explained their position to be that they will not seek the return of any privileged documents previously produced, but did not intend such production, and therefore should not be held to have made a voluntary waiver of their privilege. This explanation is consistent with the exchanges which took place during Mr. Shute's deposition, and barring some showing by the plaintiff, not made to date, that it is incorrect, the Court accepts it as true for purposes of this decision.

Even an inadvertent waiver may extend to documents not produced which relate to the same subject matter as the documents for which the privilege was waived. The rationale for such an implied extension of a waiver is set forth in 8 Wigmore, Evidence § 2327 at 635–636:

"What constitutes a *waiver by implication* ?

"Judicial decision gives no clear answer to this question. In deciding it, regard must be had to the double elements that are predicated in every waiver, i. e., not only the element of implied intention, but also the element of fairness and consistency. A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the re-

mainder. He may elect to withhold or to disclose, but after a certain point his election must remain final. * * * "

See also *Duplan Corporation v. Deering Milliken Research Corporation*, 397 F.Supp. 1146, 1161–1162 (D.S.C.1974); *American Optical Corporation v. Medtronic, Inc.*, 56 F.R.D. 426, 431–432 (D.Mass.1972); *Technitrol, Inc. v. Digital Equipment Corp.*, 18 Fed. Rules Serv.2d 561 (N.D.Ill.1974). As stated in *Duplan Corporation*, supra, at 1161:

> "When a client voluntarily waives the privilege as to some documents that the client considers not damaging and asserts the privilege as to other documents that the client considers damaging, the rule compelling production of all documents becomes applicable. * * * "

Defendants assert that they gained no advantage through disclosure of the privileged documents. The Court, having examined both sets of disclosed documents, agrees that their production is of no benefit to defendants. Therefore, fairness in this case does not require that their privilege should cease, and the Court will not require it.

■ The Court has considered one final point in regard to this discovery request which was not raised by the plaintiff but is of some potential relevance should a claim of privilege be raised in the future, and that is that the attorney-client privilege protects only communications pertaining to legal assistance and advice and does not extend to business advice given by an attorney to a client, or to inter-client communications designed to communicate only business or technical data. *Burlington Corporation v. Exxon Industries*, 65 F.R.D. 26 (D.Md.1974); *United States v. International Business Machines Corporation*, 66 F.R.D. 206 (S.D.N.Y. 1974); 8 Wigmore, Evidence § 2296; 8 Wright & Miller, Federal Practice and Procedure: Civil § 2017 at 137. Where an attorney gives advice of a general nature to a corporate client and also advises on the

resolution of troubled loans made by the client, the line between business and legal advice may be fine indeed. Having examined the documents submitted in camera in light of this consideration, however, the Court is satisfied that they were prepared for the primary purpose of giving legal advice or, in the case of the inter-client communications, for the purpose of obtaining legal advice.

*ORDER*

For the foregoing reasons,

IT IS ORDERED that the plaintiff's motion to compel Foley & Lardner's compliance with plaintiff's subpoena duces tecum is denied.

IT IS FURTHER ORDERED that plaintiff's request for the production of the documents submitted to the court in camera by defendants on October 5, 1979, is denied.

IT IS FURTHER ORDERED that the documents submitted to the court in camera on October 5, 1979, by the defendants be sealed and filed in the court record, with the exception of the 11 documents previously produced to the plaintiff by the defendants.[9]

---

**9.** . The 11 documents excepted from the order are, in defendants' first category, document 2; in defendants' second category, documents 53, 61, 67, 70, 72, and 74; and in defendants' third category, documents 10, 11, 17, and 27.