**Elizabeth VALENTE et al.,
Plaintiffs,**

**v.**

**PEPSICO, INC., et al., Defendants.**

**Civ. A. 4537.**

United States District Court,
D. Delaware.

Aug. 25, 1975.

---

3. See Rule 6 of the General Rules for the Southern and Eastern Districts of New York.

Rodman Ward, Jr., Prickett, Ward, Burt & Sanders, Wilmington, Del. of counsel, for plaintiffs; Herbert E. Milstein, Harold E. Kohn, P.A., Washington, D.C., for plaintiffs.

Hugh L. Corroon, Potter, Anderson & Corroon, Wilmington, Del., for defendants.

## MEMORANDUM OPINION ON PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

CALEB M. WRIGHT, Senior District Judge.

This is a class action brought by plaintiffs, who represent the minority shareholders and warrant holders of Wilson Sporting Goods Co. ("Wilson"). The case arises from the efforts of the plaintiffs originally to enjoin, and presently to seek damages, arising from the merger of Wilson into the defendant PepsiCo. ("PepsiCo"). PepsiCo became, in February, 1970, the majority shareholder in Wilson, by the purchase of a block of stock amounting to approximately 74% of the outstanding shares. Between that time and December, 1972, PepsiCo, through its officers, considered various methods and took various actions resulting in the eventual merger of Wilson into PepsiCo under the Delaware Short Form Merger Statute. As part of the accomplishment of the merger, the minority shareholders in Wilson were offered $17.50 in cash for their shares. In addition, outstanding obligations of Wilson included a series of warrants, giving the holder the right to purchase a share of Wilson for $20.50, the option period running through 1978. As part of the merger proposal, the holders of the warrants were offered $3.50 for each warrant. The minority shareholders and warrant holders brought this action claiming that certain representations made by the defendant PepsiCo and its officers were untrue; that the arrangement offered to the plaintiffs was unfair; and otherwise charging violations of SEC Rule 10(b)(5) and the Securities Act of 1934, as well as pendant claims of fraud.

This motion is brought by the plaintiffs to compel the production in discovery of certain documents to which the defendant objects, raising grounds of relevance and attorney-client privilege. The issue was briefed, and oral argument heard by the Court on August 12, 1975. The Court reserved ruling following oral argument because of the complexity of the issues, particularly as they related to the attorney-client privilege. For the reasons discussed, *infra,* this Court holds that the documents are relevant, and that due to the circumstances of this case, the attorney-client privilege does not attach. The documents are therefore discoverable by the plaintiffs.

### A. *Facts Necessary To Decision.*

Prior to discussing the issues of relevancy and privilege, it is important to note the complex intertwining of relationships which make up this case.[1] The Court notes initially that at the time of the events in question, PepsiCo owned some 74% of the stock,[2] and through that ownership exercised some control over the affairs of Wilson. It is undisputed that various officers of PepsiCo sat on the Board of Wilson, and that Wilson's officers were appointed at the direction of PepsiCo as controlling shareholders. During this time,[3] the general counsel of PepsiCo,[4] was among the PepsiCo officials who sat on the Board of Wilson.

As a result of its ownership of a controlling interest in Wilson, PepsiCo owed a fiduciary obligation to Wilson and to the minority shareholders. See, e. g., *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1289 (2d Cir. 1972); *Grace v. Grace National Bank of New York,* 465 F.2d 1068, 1071 (2d Cir. 1972); and *Maggiore v. Bradford,* 310 F.2d 519, 521 (6th Cir. 1962). A similar fiduciary duty was, of course, also borne by the members of the Board of Wilson including those who were PepsiCo officers. Such a fiduciary obligation runs necessarily to protect the interests of the minority from domination and overreaching by the controlling shareholder.

The documents in issue here arise from efforts by PepsiCo, through its house counsel, outside counsel and others, to determine the consequences of various alternative forms of merger of the two corporations. Of particular relevance to PepsiCo were the tax consequences, since not only did PepsiCo wish to keep its own tax burden as a result of the merger as light as possible, but also sought to preserve certain tax benefits which Wilson had. In so doing, PepsiCo had originally sought a tax ruling from the IRS on one form of the merger, which it preferred. A favorable ruling was not forthcoming, and the various opinions, communications and studies herein at issue seemingly arose from PepsiCo's attempts to develop and select an alternative method.

### RELEVANCE

Among the information sought by plaintiffs herein are certain studies un-

---

1. The question of liability is ultimately to be resolved in this case, following a full hearing. Any discussion of facts herein in no way affects the ultimate finding of facts and any judgment of liability which may be made. Moreover, since the facts discussed herein are not the subject of dispute between the parties, the Court has no occasion to discuss the burden of proof which might otherwise be applicable.

2. This ownership was the result of a purchase of a block of stock owed by Ling-Temco-Vought in February of 1970. Later purchases by PepsiCo from the open market resulted in increasing the ownership to upwards of 80%.

3. From March, 1970 until the merger.

4. Mr. Peter DeLuca was general counsel until March of 1971 and sat on the Wilson Board until that time. He was, for reasons not appearing on the record, subsequently replaced as general counsel by Mr. James Frangos, a partner in the firm of Mudge, Rose, Guthrie & Alexander, evidently at that time outside counsel to Pepsico.

dertaken by PepsiCo of the tax consequences of various forms of merger.[5] PepsiCo objects to the production on the grounds that the information is not relevant and will not lead to relevant information. The basis of this argument is that although plaintiffs have claimed fraud and misrepresentation, and now assert an obligation on the part of PepsiCo to share the tax benefits received from the merger, such a sharing of tax benefits is not required by law, and that the public was informed (and ought in any event to be aware) that tax planning considerations were involved in PepsiCo's various alternatives.

This Court need not decide whether PepsiCo had an obligation to "share" the tax benefits which it is alleged to have reaped from the merger with Wilson, with the Wilson minority shareholders. Compare, *Grace v. Grace National Bank of New York*, 465 F.2d 1068, 1071 (2d Cir. 1972), and In the Matter of Christiana Securities Co., SEC, 1974 Transfer Binder, CCH Fed.Sec.L.Rep. ¶ 80,0054; with Brudney and Chirelstein, *Fair Shares in Corporate Mergers and Takeovers,* 88 Harv.L.Rev. 297 (1974). The issue here is not whether the Wilson minority had the right to share in the tax benefits which accrued to Wilson; rather the issue is whether the price offered by PepsiCo to the Wilson minority and

warrant holders was fair and equitable, and whether in making the offer, PepsiCo disclosed the relevant information necessary to allow the Wilson minority and warrant holders to make their decision. See, *Grace v. Grace National Bank, supra.*[6]

Here the tax studies conducted by PepsiCo are relevant insofar as they indicate the price considerations being used by PepsiCo and the effect of the tax advantages to PepsiCo in determining what a fair price for the Wilson minority would be. They are also relevant insofar as they describe the information possessed by PepsiCo at the time when it was its duty to make disclosures of necessary information on a subject which the minority shareholders and warrant holders were entitled to consider prior to making their decision.[7]

Since the information contained in the tax studies is relevant to whether the defendant PepsiCo misrepresented facts in its tender offer, and to whether the terms of the offer made to the minority shareholders and warrant holders were not unduly disadvantageous to them, PepsiCo's objection is not well taken. Insofar as PepsiCo objected to the discovery of the documents here at issue on grounds of relevancy, the documents are to be produced.

5. The briefs of the parties do not describe the author of the studies, nor how many such studies there are. The Court notes that certain of the documents as to which the attorney-client privilege is claimed also relate to tax matters. Whether the documents which are claimed to be irrelevant are in addition to or the same as those discussed *infra,* is unclear. Of course, if the documents are irrelevant, there would be no need to discuss the attorney-client privilege.

6. "However, when, as here, a statutory plan is designed to offer significant tax benefits to a parent corporation while explicitly providing for the equitable treatment of minority shareholders in the subsidiary, we see no violation of essential fairness in allowing the parent to realize these benefits despite the

existence of minority shareholders, however few, who for reasons of their own would prefer some other method to effect the transaction." 465 F.2d at 1072.

The issue, as the Second Circuit made clear, is the fundamental fairness with which the controlling shareholder has treated the minority interests. The parent need not sacrifice its own interests, but it must not unduly disadvantage any minority shareholder.

7. This should not be taken as a determination that PepsiCo ought to have disclosed the tax consequences or all of the information in order to make its tender offer complete. Such a determination must await the outcome of the case.

ATTORNEY-CLIENT PRIVILEGE

As to six documents sought by the plaintiffs, PepsiCo has objected on the grounds that the documents are covered by the attorney-client privilege, and, therefore, may not be disclosed. The documents cover a period of several years, and are from several different individuals acting as house or outside counsel for the defendant PepsiCo.[8]

Plaintiffs claim that the attorney-client privilege ought not to attach here, because as to some documents it was allegedly waived by deposition testimony concerning their contents, and because, under the principles enunciated in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th

Cir. 1970), a corporation ought not to be able to withhold this information from persons in the position of the plaintiffs.

██ The Court finds this issue to be more complex than a mere waiver problem,[9] or the situation presented in *Garner*. It has instead required an examination of the function of the rule, and of the role of attorneys and other fiduciaries in light of the requirements of the law.[10]

The attorney-client privilege is not complex on its face. Whatever formulation is used, either that of Judge Wyzanski in the *United Shoe* case,[11] or that of Professor Wigmore in his treatise on evidence,[12] the elements of the privilege

---

8. Six documents are claimed to be within the attorney-client privilege:

1. A memorandum from house counsel to a corporate official in charge of tax planning concerning alternative methods of acquiring stock in the event of an unfavorable revenue ruling.

2. A memorandum from outside counsel to PepsiCo concerning one method of acquiring shares of Wilson.

3. A memorandum from house counsel to the same official as in document 1 *supra,* concerning a particular alternative following an unfavorable revenue ruling.

4. A memo from general counsel and outside counsel to the President of PepsiCo concerning acquisition of minority interests.

5. A formal legal opinion by Delaware counsel to New York counsel concerning rights of the minority warrant holders under Delaware law.

6. A formal legal opinion from outside counsel to PepsiCo concerning a merger plan and the rights of various parties.

9. The plaintiffs have asserted that the privilege was waived as to certain documents by the answer of a witness during deposition. The Court has examined the deposition and the context of the answer, and finds that there was no knowing waiver of the privilege, but merely an identification of the source of the witness' own ideas. See, *IBM v. Sperry Rand Corp.*, 44 F.R.D. 10 (D.Del. 1968), which makes clear that a waiver must be knowing and intentional, though no special words are needed to effectuate it. 44 F.R.D. at 13.

10. In the present situation, the suit is brought subject to a federal cause of action

under the securities laws, with pendant state law claims. The Court, therefore, treats the issue as one involving a determination under the federal rule of privilege and not the state rule as would be necessary under diversity jurisdiction. See, *Simpson v. Motorists Mutual Ins. Co.*, 494 F.2d 850 (7th Cir. 1974); *Hyde Construction Co. v. Koehring Co.*, 455 F.2d 337 (5th Cir. 1972). Similarly, the Court is not faced with a choice of law problem as to which state's privilege rules ought to apply. *Id.*

11. "The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass. 1950).

12. "(1) where legal advice of any kind is sought; (2) from a professional legal advisor in capacity as such; (3) the communication relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except the protection be

are substantially the same. Protected are the communications between an attorney acting in his professional capacity and a client where the communications are intended to be confidential, and the confidentiality is not waived, expressly or by implication.[13] The short description does not, however, fully illuminate the requirement that the privilege be not otherwise in violation of a weightier public policy than the protection of client confidence in his attorney.[14]

The purpose of the privilege is to foster the confidence of the client and enable him to communicate without fear in order to seek legal advice. See, *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974). Courts have nonetheless made it clear that the privilege, as it blocks the usual rule requiring full disclosure in an effort to establish the truth, will be and ought to be confined within narrow limits. *In re Horowitz*, 482 F.2d 72 (2d Cir. 1973); *United States v. Goldfarb*, 328 F.2d 280 (6th Cir. 1964). Thus, where an attorney has disclosed the truth in order to prevent his being subjected to unjust charges, the courts have found no violation of the privilege, even though the result may be to harm certain interests to the client or former client. *Magerhofer v. Empire Fire and Marine Ins. Co.*, 497 F.2d 1190 (2d Cir. 1974). Similarly, the privilege fails to attach where the communication sought to be protected was in connection with the fraudulent or tortious activities of the client. *United States v. Shewfelt*, 455 F.2d 836 (9th Cir. 1972); *Hyde Construction Co. v. Koehring Co.*, 455 F.2d 337 (5th Cir. 1972); *United States v. Aldridge*, 484

F.2d 655 (7th Cir. 1973); *Garner v. Wolfinbarger, supra.*

This Court has long adhered to the rule that house counsel are to be treated in the same fashion as outside counsel with respect to activities in which they are engaged as attorneys. Where house counsel is engaged in giving business advice or mere technical information, no privilege attaches. Where he acts as an attorney, however, the confidences revealed in the process of communication as to those issues should be treated in the same manner as those to any other attorney. *Burlington Industries v. Exxon*, 65 F.R.D. 26 (D.Md. 1974); *Lee National Corp. v. Deramus*, 313 F.Supp. 224 (D.Del.1970); *Malco Manufacturing Co. v. Elco Corp.*, 45 F. R.D. 24 (D.Minn.1968); *Sperti Products, Inc. v. Coca Cola Co.*, 262 F.Supp. 148 (D.Del.1966).

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), on remand, 56 F. R.D. 499 (S.D.Ala.1972); and *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211 (N.D. Ill.1972), stand generally for the proposition that where a corporation seeks advice from legal counsel, and the information relates to the subject of a later suit by a minority shareholder in the corporation, the corporation is not entitled to claim the privilege as against its own shareholder, absent some special cause. The rule of *Garner* as followed in *Meister Brau* is of some relevance here, but is not controlling since we deal here with the application where a minority shareholder seeks information not from his own corporation, but from a separate corporation which was a controlling shareholder in his.[15] More important is the basis of those decisions, resting in

---

waived." 8 Wigmore § 2292 (McNaughten Rev.Ed.1961).

13. See, *IBM v. Sperry Rand Corp.*, 44 F.R. D. 10 (D.Del.1968).

14. See *Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), quoted in *IBM v. Sperry Rand Corp., supra*, at 13 fn. 2.

15. Plaintiffs made some claim that since there were interlocking directorates between the corporations and the officers of Wilson reported to PepsiCo and that in other ways Wilson was treated as a subsidiary of PepsiCo, the facts in *Garner* and *Meister Brau* ought to be seen as controlling, urging that there were no distinctions between the corporations. The Court refuses to so hold.

each case on the understanding that a corporation is, at least in part, the association of its shareholders, and it owes to them a fiduciary obligation which is stronger than the societal policy favoring privileged communications.

■ The documents in question here must, therefore, be seen in light of the obligations which are part of the circumstances of this case. The Court makes no rule regarding discovery as to corporations in general: it is willing to assume that corporations are ordinarily entitled to the attorney-client privilege, and that they may claim that privilege, especially against the outsider who seeks information. See, *Burlington Industries v. Exxon Corp., supra.* Nonetheless, where the documents are produced in situations which involve other obligations of attorneys or shareholders, the applicability of the privilege must be determined in light of the obligations and policies to be served.

■ With respect to Documents Numbers 4 and 6, both memoranda from counsel to PepsiCo or officers of PepsiCo, the decision is clear. At the time Document Number 4 was drafted, its author, Peter DeLuca sat as a member of the Board of Directors of Wilson. He was, in addition, General Counsel to PepsiCo. In those positions, he owed separate fiduciary obligations to two separate entities and their interests. He could not subordinate the fiduciary obligations which he owed to Wilson and the minority shareholders of Wilson to those of his client PepsiCo. The fact that Wilson may not have had an attorney-client relationship with him is of no import. His knowledge in one capacity cannot be separated from the other, nor

can his duties as a fiduciary be lessened or increased because of professional relationship. It is a common, universally recognized exception to the attorney-client privilege, that where an attorney serves two clients having common interests and each party communicates to the attorney, the communications are not privileged in a subsequent controversy between the two. *Simpson v. Motorists Mutual Ins. Co.,* 494 F.2d 850 (7th Cir. 1974); *LaRocca v. State Farm Mutual Auto Ins. Co.,* 47 F.R.D. 278 (W.D. Pa.1969). The source of the rule is not clear, whether based on an assumption that where an attorney serves two different clients in relation to the same matter, neither anticipates that communications will have the same degree of confidence; or, as is more likely, the court will not allow the attorney to protect the interest of one client by refusing to disclose information received from that client, to the detriment of another client or former client. The fiduciary obligations of an attorney are not served by his later selection of the interests of one client over another.

■ The situation here is more complex. There can be no doubt, however, that Mr. DeLuca owed fiduciary duties to both Wilson and PepsiCo. Just as importantly as a director of Wilson, his obligations ran to the shareholders of Wilson, and the protection of their best interests. PepsiCo cannot now claim a privilege as to his communications with PepsiCo officials concerning the interests of the Wilson shareholders. Document Number 4 is therefore discoverable.

■ Document Number 6 consists of a memorandum from Mudge, Rose,

---

Whatever duties PepsiCo may have owed to the Wilson minority, as discussed *infra,* it appears to have maintained the separate corporate identity. Control of policy and personnel is not alone sufficient to pierce a corporate veil: it is the necessary accompa-

niment of majority control. The validity of *Garner* and *Meister Brau* to their respective fact situations is, therefore, not on point here, though their reasoning may be used by analogy.

Guthrie & Alexander, evidently outside counsel to PepsiCo, concerning the various recommended forms of the merger. At the time of the drafting of the memorandum, a general partner of Mudge, Rose, Mr. James Frangos, had replaced Mr. DeLuca on Wilson's board. Mr. Frangos, therefore, owed to Wilson and Wilson's shareholders and warrant holders the same obligation which Mr. DeLuca had. Through Mr. Frangos' seat on the Board, Mudge, Rose, as his partnership, carried those same obligations. Once again, the fact that the firm carried additional professional responsibilities to PepsiCo is unimportant. For the reasons discussed *supra*, the memorandum listed as Document Number 6 is discoverable by the Wilson minority.

Documents Numbers 1, 2, 3 and 5 present a somewhat different situation. Documents 1 and 3 are memoranda from house counsel to a Vice President in Charge of Tax Administration for PepsiCo. Whatever fiduciary obligations are attached are therefore only those which attach to PepsiCo and its officers: there is not in this situation the representation of two interests discussed *supra*. Document Number 2 is a memorandum from Mudge, Rose, Guthrie & Alexander, evidently signed by Mr. Frangos prior to the time when Mr. Frangos joined the Wilson Board. Since it does not appear that Mr. DeLuca was a partner in the Mudge firm, this document also appears to be in a category different than those described *supra* involving the representation of two interests.

Document Number 5 is an opinion from Delaware counsel as attorneys of PepsiCo to Mudge, Rose, evidently describing certain rights of the Wilson minority under Delaware law. At this time, Mr. Frangos was sitting on the Wilson Board, but it does not appear that any member of the Delaware firm was in a similar conflicted position. The memorandum appears to.be one between co-counsel, and not one from the Delaware firm to the New York firm as attorney and client. It, therefore, appears to be in a category different than that described previously.

These latter four documents do have a common element, however. In each instance, the recipient of the advice or the client whose interest is being ascertained, had fiduciary obligations which ran to Wilson and the Wilson minority. It is no longer open to question that a majority shareholder who controls a corporation must not use his position to the undue disadvantage of the minority: his obligation is to the corporation and not simply to himself. See, *Lebold v. Inland Steel*, 125 F.2d 369 (7th Cir. 1941); *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955).

These documents are the result of inquiries by the controlling shareholder, as to matters which touch upon the interests of the minority shareholders, and from their titles appear to be directly concerned with the duties which the controlling shareholder and its controlled corporation owed to the minority.

This Court holds that under these circumstances, the documents presented are discoverable. The attorneys whose opinions were written to PepsiCo could not avoid PepsiCo's own obligations as a fiduciary. Where the fiduciary has conflicting interests of its own, to allow the attorney-client privilege to block access to the information and bases of its decisions as to the persons to whom the obligation is owed would allow the perpetration of frauds.[16]

---

16. The Court here does not hold that the attorney-client privilege was used in the perpetration of fraud. See *United States v.*

*Shewfelt, supra.* Rather the decision of the Court is that where a fiduciary represents conflicting interests, particularly where one

A fiduciary owes the obligation to his beneficiaries to go about his duties without obscuring his reasons from the legitimate inquiries of the beneficiaries.

There are, of course, limits on such an obligation. Were the claim here one made in bad faith, or one where the interests of the great majority of the beneficiaries would be better served by the privilege, the case would be different indeed. Similarly, if the information sought were a trade secret, or otherwise covered by other public policies which would give added weight to a need for secrecy, the obligations of the fiduciary might have entirely different circumstances. But those situations are not this situation. The power of courts to determine such matters individually, in light of their facts, will adequately protect the interest of both fiduciaries and beneficiaries.

The defendant urges that the Court should not allow discovery in the situation of the fiduciary with conflicted obligations, in order to foster the seeking of professional advice by the fiduciary who finds himself in that position. A fiduciary will not be less likely in this situation either to seek advice or fully disclose the facts, since it is in his interest to be aware of adverse consequences of his conflicted position, which is or will be obvious prior to the issuance of any discovery order.

For these reasons, the Court orders the production of the documents listed as Numbers 1–6 in Defendant's Memorandum, and those documents pertaining to certain tax studies as described in the papers before the Court.

So ordered.

of those interests is its own, the only purpose to be served by the use of the privilege to withhold information from those to whom the fiduciary obligation runs is fraud. The more general and important right of those who look to fiduciaries to safeguard their interests, to be able to determine the proper functioning of the fiduciary, outweighs the need for the privilege and its base of attorney-client confidence.