**FINLEY ASSOCIATES, INC., a Connecticut corporation, and Rudy Williams, Plaintiffs,**

v.

**SEA & PINES CONSOLIDATED CORP., a Delaware corporation, Mario Capano, Joseph J. Capano, Louis J. Capano, Joseph Cashman, and Willow Associates, Inc., a Delaware corporation, Defendants.**

**Civ. A. No. 87–562 MMS.**

United States District Court, D. Delaware.

Jan. 31, 1989.

Joseph M. Hassett of Hogan & Hartson, Washington, D.C., for plaintiffs Finley Associates, Inc. and Rudy Williams.

George H. Seitz, III of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendants Sea & Pines Consolidation Corp. and Louis J. Capano.

William D. Bailey, Jr. of Bayard, Handelman & Murdoch, P.A., Wilmington, Del., for defendant Mario Capano.

Louis P. Agostini, Jr. of Agostini, Levitsky & Agostini, Wilmington, Del., for defendant Joseph L. Capano.

Lawrence M. Sullivan, Wilmington, Del., for defendants Joseph Cashman and Willow Associates, Inc.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

This opinion resolves two motions by plaintiffs Finley Associates, Inc. and Rudy Williams. The first motion seeks to have an amendment to the complaint relate back to the time the complaint was filed. The second motion seeks an order compelling defendant Mario Capano to allow his former attorney to testify as to matters Capano claims are privileged. For the reasons stated below, the motions of plaintiffs will be granted.

## BACKGROUND

In a complaint filed October 27, 1987, plaintiffs state that they entered a contract with defendants in November 1986 in which plaintiffs agreed to assist the defendants in obtaining financing for purchase of property in North Bethany Beach, Delaware. Plaintiffs allege they performed their obligations in the bargain, because they were the cause behind the procuring of a $16,000,000 loan defendants obtained; therefore, according to plaintiffs, defendants owe them under the alleged contract a fee of 3% of the loan as well as an equity interest in the project. In his answer and in his deposition testimony, defendant Mario Capano has denied that he offered plaintiffs an equity interest in the enterprise in

Roderick R. McKelvie of Ashby, McKelvie & Geddes, Wilmington, Del., of counsel,

North Bethany Beach. Defendant Joseph Cashman has also testified by way of deposition that Capano offered him a 3% interest in the enterprise. Capano similarly denies this contention.

### A. Amended Complaint

On July 28, 1988, plaintiffs moved to amend the complaint to add a second count asserting a claim against defendant Joseph Cashman. Cashman was named as a defendant in the original complaint. The claim was based on a February 10, 1987 letter from Cashman to Peter Kelly of Finley Associates. Cashman wrote the letter after defendants settled on the purchase of the property in North Bethany Beach and refused to pay or recognize plaintiffs' claim pursuant to the alleged agreement. In the letter to Kelly, Cashman (1) apologized for involving Kelly "in a transaction with people who have demonstrated a lack of integrity"; (2) recognized that without plaintiffs' "contacts and assistance" the deal would have failed; and (3) offered to assign one-half of his interest.

In the amendment to the complaint, plaintiffs allege Cashman has a 3% interest in the enterprise to develop the land and seek one-half of the 3% interest as alternative relief.

In their motion to amend, plaintiffs sought an order under Rule 15(c) of the Federal Rules of Civil Procedure [1] that the amendment would relate back to the date of the filing of the complaint (i.e., October 26, 1987). This Court granted the motion to amend but reserved the issue of whether the amendment would relate back.

Plaintiffs assert the amendment relates back because the new claim set forth in the amended complaint arises out of the same transaction. Moreover, plaintiffs suggest relation back is appropriate because they raise the new claim against a defendant named in the original complaint who was on notice of the new claim contained in the amendment. Plaintiffs also maintain relation back is appropriate even if the applicable statute of limitations has lapsed. In the alternative, plaintiffs argue the claim is not barred by the statute of limitations because the applicable statute of limitations is 10 Del.C. § 8106 which provides contract claims must be brought within 3 years.

Defendants contend the amended complaint should not relate back to the filing of the complaint. First, defendants argue the allegations in the amended complaint rest on personal services performed on a quasi-contractual basis with the limitations period being one year under 10 Del.C. § 8111. Next, defendants maintain relation back is inappropriate because the amended claim is based on factual circumstances and events separate from the transaction or occurrence serving as the basis for the original complaint.

### B. Attorney–Client Privilege

On August 11, 1988, plaintiffs moved the Court to enter an order compelling an attorney, Darrell Baker, to respond to certain questions posed at his August 9, 1988 deposition. Capano's attorney objected and instructed Baker not to answer on grounds of attorney-client privilege to questions involving an alleged offer of a beachfront lot to the seller's attorney, William Lynch, by Capano. At that point Capano had not yet succeeded in buying a large parcel of land of which the beachfront lot was a component.

Plaintiffs point to two pieces of information disclosed in discovery and two pieces of information disclosed in a deposition in another case which is now part of this

---

**1.** Rule 15(c) states in pertinent part:

Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satis-

fied and, within the period provided by law for commencing the action against that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party....

record with regard to the privilege claim by Capano relating to discussions between Capano and Baker regarding the alleged offer to Lynch. First, prior to the deposition of Baker, Patricia Campbell–White, the real estate agent who represented Capano in the North Bethany Beach transaction, testified that at Baker's request she offered a free beachfront lot to the seller's attorney, William Lynch. In pertinent part, Campbell–White testified:

> Baker told me to sweeten the pot for Lynch and tell Lynch that there was an ocean-front lot in it for him.

> Sometime in October or November, prior to settlement, when I had an opportunity, one of the very few opportunities to talk to Mario directly, and I don't recall if it was on the phone or face-to-face, I told him I was fed up with Baker's insistence that I try to bribe Lynch, in so many words, that the only way that Mr. Lynch—Well, let me back up. That Mr. Lynch was only going to make the recommendation to his clients to sell this property if it was in his clients' best interest, period, whether there was something that Baker was representing that his clients would offer was not going to make the different [sic] of whether they would sell or they would not.

Dkt. 49, Ex. A (Plaintiffs' Third Motion to Compel) (excerpt from Deposition of Patricia Campbell–White at 86–87 (April 13, 1988)).

Also, plaintiffs point to written answers under oath from Vincent Ramunno, Esquire, suggesting that Capano offered a free beachfront lot to Lynch in order to obtain the property in North Bethany Beach. Ramunno's written answers under oath state in pertinent part:

> 7. State fully what you said to Capano and also what Mario Capano said to you with respect to Sea & Pines at the meeting that occurred in your office on July 17, 1987, or the day after.

> ANSWER: Mario came to my office with various documents to see if I wanted to but [sic] any lots or if I could sell any for him. He told me what a good deal he had obtained and how it was appraised for much more than he was paying for it and how he had a joint venture agreement with a bank (PSFS I believe) and that he would settle in November or December, etc. Mario told me that the property was only worth pursuing if he could get flood insurance, but that he had obtained a lead on insurance. I asked him how he got it since I and everybody else had also been interested in buying it and he told me that he had agreed to give Bill Lynch a free oceanfront lot to get the property. We discussed how disgusting that was that somebody like Bill Lynch who presents himself as being totally honest would do such a thing, etc. Mario told me that now I knew why Bill never contacted me. He said[,] "You would have thrown him out of your office." We also discussed his plans for developing the property and selling lots.

> I told Mario I was interested in 2 oceanfront lots because I wanted to build a house for my family on one and keep the other one open so as to have some open space and he told me that I would have my choice of lots except for 2 and he would appreciate any help I could give him. I told him I would take the plan down the beach for the week-end to see if anybody I knew down there was interested in buying a lot.

Dkt. 60, Ex. B (Plaintiffs' Reply Memorandum in Support of Their Third Motion to Compel) (Answer No. 7 to Ramunno's August 15, 1988 Written Answers Under Oath).

Plaintiffs also have alerted the Court to the deposition testimony of William F. Lynch, II, which has been made a part of this record. Dkt. 76A, Deposition of William F. Lynch, II (Aug. 12, 1988) (taken in *Vilone v. Sea & Pines Consolidation Corp.*, Civ.Act. No. 8940 (Del.Ch.). In his deposition Lynch indicated that Campbell–White discussed a free lot with him, although Lynch considered the discussions to be a joke. Also, Lynch testified that Baker may have discussed offering him a free beachfront lot while conversing about the North Bethany Beach property.

At his August 9, 1988 deposition, Baker testified regarding claims by others that Capano also offered them an equity interest in the project. For example, Baker testified he believed Mel Slawick claimed Capano agreed to provide him a 4% interest in the project. Baker also testified that Cashman told him that Capano offered Cashman a 3% equity interest in the North Bethany Beach enterprise.

The questions at the August 9, 1988 Baker deposition giving rise to Plaintiffs' Third Motion to Compel follow:

Q. The offer of land to Lynch, whose idea was it, and what was it to be?

MR. SEITZ: The question asks for an opinion, essentially. And if the witness has to rely on attorney/client communications in giving you that opinion, then— I'm speaking now for the corporation— I'd object.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Whose idea was it, and what was it?

MR. SEITZ: My objection still stands.

MR. McKELVIE: Okay. But you can go ahead and answer.

A. I don't know whose idea it was.

Q. What was it?

A. There was a discussion of some lot.

Q. In terms of your conversations with Pat Campbell–White, what is it that you told her?

A. I didn't tell her anything. I learned of things from her.

Q. Did you tell Pat Campbell–White to offer a free beachfront lot to Bill Lynch?

A. No.

Q. Do you know how she learned that?

A. No, I do not.

Q. Do you know whether or not she made that offer to Mr. Lynch?

A. I don't know. At this time, I can't recall.

Q. What information do you have about the topic of an offer of a beachfront lot to Mr. Lynch?

A. The conversation I had with Mrs. White, Campbell–White, whatever, and privileged conversations with Mr. Capano.

Q. What was it that you and Mrs. White talked about first?

A. She mentioned it, and I said[,] "I don't know anything about it." I mean, that's beyond the scope of an attorney.

Q. What did she say?

A. She mentioned that a lot should be offered to Mr. Lynch.

Q. And did she say anything else?

A. Not that I can recall.

Q. Did she say that she had made the offer to Mr. Lynch of a lot?

A. From my recollection, I don't recall her actually saying that that was done.

Q. Did she mention whose idea it was to offer the lot to Mr. Lynch?

A. Not that I can recall, no.

Q. Did she mention that she had made the offer to Mr. Bill Lynch?

&ast; &ast; &ast; &ast; &ast; &ast;

A. Again, I don't know.

Q. Did you ever talk to Mr. Lynch about the offer?

A. No.

Q. Do you know whether an offer was ever made to Mr. Lynch?

A. No.

Q. Did you tell Pat Campbell–White that an offer of a lot should not be made to Mr. Lynch?

A. I said that it was inappropriate and that she should discuss the matter with Mr. Capano.

Q. And did she later tell you that she had discussed the matter with Mr. Capano?

A. She may have said she talked about it, but I don't recall any specifics.

Q. Do you recall talking to Mr. Capano about the topic before the time you spoke to Pat Campbell–White?

A. No.

Q. Did you speak to Mr. Capano about the topic after you spoke to Pat Campbell–White about it?

A. It may have come up, but again, if it did, I can remember saying that it was inappropriate, and that is how it was left.

Q. Do you know—

A. It was vis-a-vis any communications that I had with anyone else.

Q. Meaning Mr. Capano or Pat Campbell–White?

A. Yes.

Q. Have you talked to anybody else other than Mr. Capano and Pat Campbell–White about the topic of offering a beachfront lot to Mr. Lynch?

A. Mr. Vavala may have been present at one conversation where it might have been brought up. But again, it was—I don't really know how it started. But again, I repeatedly reiterated that it was inappropriate, against the rules, et cetera, et cetera, et cetera.

Q. Do you have any opinion now as to whose idea it was to offer him the lot?

\* \* \* \* \* \*

A. I don't know how it came up. I don't know how it progressed. I repeatedly said it was inappropriate. Mr. Heiman may have mentioned that it was inappropriate if he had been there. I think he said that once or twice. I may have even said, if I recall correctly, that if you're going to do this kind of stuff, I don't even what to be a part of it.

Q. So that the only information you have would lead you to believe that the idea came from Pat Campbell–White?

\* \* \* \* \* \*

A. My recollection is that the first conversation I had regarding it came from her. It may have been brought up by Mr. Capano later in passing where I—he might have mentioned—

MR. BAILEY: Objection. Now we're getting into conversations with your client.

A. Given my recollection, it had to initiate with Mrs. White. She was the one who negotiated directly with Mr. Lynch generally, except for as to the parameters of the specific contract between the parties.

Q. Right. So you don't have any information that leads you to believe that the source of the offer was anyone else other than Pat Campbell–White?

A. No. Not of my independent knowledge, no.

Q. And Mr. Capano never suggested to you that you have Pat Campbell–White make the offer of the lot to Mr. Lynch?

MR. BAILEY: Objection. Direct him not to answer. Attorney/client privileges.

With regard to Baker's testimony regarding discussions with Capano of an offer of property to Lynch, plaintiffs assert that the communications between Baker and Capano are not protected by the attorney-client privilege because the information relates to potentially fraudulent and criminal conduct. Also, plaintiffs argue discovery of this information is appropriate because Baker was acting as a mere conduit of information for Capano, thereby precluding application of the attorney-client privilege. Finally, with regard to the question of whether Capano wanted Baker to have Campbell–White offer a beachfront lot to Lynch, plaintiffs contend this information cannot be covered by the attorney-client privilege because Capano never intended that communication to remain confidential.

Defendants argue all of the communications between Capano and Baker with regard to the offer of property to Lynch are properly encompassed within the attorney-client privilege and thus protected from discovery under Rule 26, Fed.R.Civ.P. Defendants urge plaintiffs have not made the requisite *prima facie* showing of fraud to qualify for the recognized exception to the attorney-client privilege, and that, at best, plaintiffs have only made a showing fraudulent conduct *might* have occurred.

### DISCUSSION

A. *Amended Complaint—Relation Back*

Under Rule 15(c) whenever a claim asserted in an amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading, the amendment relates back. In the immediate case, the new claim arises out of the same transaction or occurrence raised in the original complaint. The original complaint alleges an agreement was formed in November, 1986 between plaintiffs and defendants, including Joseph Cashman, entitling

plaintiffs to certain compensation if plaintiffs procured a loan for defendants for the purchase of property in North Bethany Beach. The amended complaint is based on a letter from Joseph Cashman to plaintiffs dated February 10, 1987 in which, plaintiffs allege, Cashman promised plaintiffs one-half of his interest in the North Bethany Beach enterprise.

This amended claim arose out of the transaction or occurrence pleaded in the original complaint. The Cashman letter references the original agreement between plaintiffs and defendants. Cashman's letter also acknowledges plaintiffs' efforts to secure financing for the North Bethany Beach project as plaintiffs allege in their original complaint. Moreover, the alleged offer by Cashman in his letter stems from the circumstances alleged in the original complaint—that is, the alleged breach of the original agreement led Cashman to send his letter referenced in the amended claim. Not only is the amended claim based upon the original claim, but defendant Cashman was also on notice of the circumstances surrounding the original complaint and amended claim. The basis of the claim in the amended complaint is the circumstances alleged in the original complaint. It therefore follows the amended claim relates back to the filing of the original complaint pursuant to Rule 15(c).[2] *See, e.g., Hill v. Equitable Bank, National Association,* 599 F.Supp. 1062, 1071–72 (D.Del.1984) (defendant received adequate notice in original complaint of underlying transaction thus plaintiff permitted to amend complaint because defendant should know whole transaction at issue); *Kern Oil & Refining Co. v. Tenneco Oil Co.,* 840 F.2d 730, 735–36 (9th Cir.), *cert. denied,*

—— U.S. ——, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988) (new claims by plaintiff related back to original complaint filed against same defendant because amended claim arose out of original transaction or occurrence); *see generally* Moore's, at ¶ 15.15[3], 15–14–49 (same transaction test of Rule 15(c) not mechanical or restrictive; court should examine whether original pleading provides defendant with fair notice of general factual situation upon which amended claim based); *Yorden v. Flaste,* 374 F.Supp. 516, 518–19 (D.Del.1974) (Rule 15(c) should be read together with general provision in Rule 15(a) that leave to amend shall be freely given by court where justice so requires).

### B. *Attorney–Client Privilege*

The issue raised in the discovery dispute between the parties over the appropriate scope of the attorney-client privilege is whether Capano's communications with Baker regarding a purported offer of a beachfront lot to Lynch falls within a recognized exception to the attorney-client privilege.

Federal Rule of Evidence 501 provides that state law governs the scope of the attorney-client privilege in this diversity action.[3] Delaware Rule of Evidence 502 provides the general rule defining the scope of the attorney-client privilege. Rule 502(b)(1) states:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal servic-

---

**2.** The Court need not consider the contentions of the parties regarding application of the state statute of limitations as Rule 15(c) controls. *See* J. Moore, *Moore's Federal Practice* ¶ 15.15[2], at 15–144 (1987) (question of relation back of amendments to pleadings is properly one of federal practice under Rule 15(c) and no warrant exists for resort to state law).

**3.** Federal Rule of Evidence 501 provides:
Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authori-

ty, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

es to the client ... between himself ... and his lawyer.

The information requested in the deposition of Baker falls within this definition.[4]

The purpose of the attorney-client privilege is to allow potential litigants to obtain legal counsel uninhibited by any fear such confidential communications might be disclosed. *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 367 (D.Del.1975). The privilege serves the important public policy of facilitating free discussions between a client and attorney and should not be lightly disregarded. However, the privilege cannot shelter communications that abuse the privilege. *Id. See also Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) (Cardozo, J.). The attorney-client privilege does not extend to communications between an attorney and a client where the purpose of the communication was to further an intended fraud or crime. Rule 502(d)(1) of the Delaware Rules of Evidence provides:

> There is no privilege under this rule ... [i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably knew to be a crime or fraud....

There is a paucity of authority in Delaware as to the standard to be applied in ascertaining whether the exception to the privilege applies. The only case revealed by independent research providing a clear statement of the standard is *Sealy Mattress Co. of New Jersey, Inc. v. Sealy Inc.*, Civ.Act. No. 9953, slip op. (Del.Ch. June 19, 1987) [1987 WL 12500]. According to *Sealy*, in order to fall within the exception to the attorney-client privilege a mere allegation of fraud is not enough; rather, a party contending a communication falls within the crime or fraud exception to the privilege must make a preliminary *prima facie* showing that a reasonable basis exists to believe the attorney-client communication was made in furtherance of a crime or fraud.[5] Federal courts applying federal law employ the same standard as *Sealy*. *See United States v. Ballard*, 779 F.2d 287, 293 (5th Cir.), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986) (*prima facie* evidence found that defendant conveyed property to attorney in scheme to defraud creditors); *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir.1984) (must present *prima facie* evidence to show reasonable basis to suspect fraud intended by communication between attorney and client); *United States v. Zolp*, 659 F.Supp. 692, 715 (D.N.J. 1987) (*prima facie* evidence required); *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 155 (D.Del.1977) (same); *see also Clark*, 289 U.S. at 15, 53 S.Ct. at 469;[6] *but see* J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 503(d)(1)[01], at 503–71 (1986) (no test under crime or fraud exception to attorney-client privilege, but, under Delaware Rule of Evidence 503(d)(1), such absence "has the advantage of leaving the question to the good sense of the trial judge").[7]

Courts discussing the crime of fraud exception do not examine whether the ele-

4. Plaintiff urges to the extent Capano may have instructed Baker to request Campbell–White to take any action, Capano could not have intended such communications to remain confidential. This issue is not reached because the Court holds that the motion to compel falls within the crime or fraud exception to the attorney-client privilege.

5. It is my understanding that under Delaware practice the unpublished *Sealy* opinion is not *stare decisis*. It is cited to merely demonstrate Vice Chancellor Jacobs employed the standard without extended discussion.

6. In *Clark*, Justice Cardozo stated:
   [T]here must be 'something to give colour to the charge [that the privilege is fraudulently or otherwise improperly sought];' there must be '*prima facie* evidence that [the charge of impropriety] has some foundation in fact.' *Clark*, 289 U.S. at 15, 53 S.Ct. at 469 (quoting *O'Rourke v. Darbishire* [1920] A.C. 581, 604).

7. Weinstein also states:
   Whether a particular communication was intended for an unlawful purpose is a conclusion that is inextricably intertwined with the particular facts of the case. How many of these facts must be divulged in order for the judge to be able to rule on whether the privilege applies, and what kind of evidence he hears in deciding this question must be left to his discretion.
   Weinstein, at 503–71.

ments of an *individual* crime are met as defendant Capano argues; rather, courts examine whether a *prima facie* case exists to believe any criminal or fraudulent *activity* occurred in the attorney-client relationship. For example, in *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039, the court stated:

> If the advice was sought in furtherance of a fraud that is not necessarily a violation of the criminal code, the communication is nonetheless unprivileged.... [The] assumption that the exception applies only if the seeker of the document proves that a crime (or fraud) has actually taken place is doubly defective. The crime or fraud need not have occurred for the exception to be applicable; it need only have been the objective of the client's communication. And the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent.

In the immediate case plaintiffs have adduced *prima facie* evidence showing a reasonable basis exists to believe that certain communications between Capano and Baker were in furtherance of a crime or fraud. Plaintiffs point to four items which constitute a *prima facie* showing that discussions occurred between Capano and his attorney, Baker, relating to the offer of a lot to Lynch, in order to obtain preferential treatment in a transaction for land: 1) the deposition testimony of Patricia Campbell–White that Baker insisted Campbell–White offer Lynch a free lot so that Baker's client, Capano, would be better positioned to pursue the North Bethany Beach property; 2) the sworn statement of Vincent Ramunno that Capano agreed to give Lynch a free oceanfront lot in order to obtain the property at issue; 3) the deposition testimony of Lynch that Campbell–White discussed a free lot with him on different occasions, although Lynch testified that he believed the discussions with Campbell–White were in jest. Dkt. 76A (record in this action), Deposition of William F. Lynch, II, at 190–98 (Aug. 12, 1988) (taken in *Vilone v. Sea & Pines Consolidation Corp.*, Civ.Act. No. 8940 (Del.Ch.)); and 4)

the statement by Lynch in the same deposition that Baker may have mentioned an offer of a free oceanfront lot in the context of discussions regarding the property at issue. *Id.* at 194.

These four items constitute the requisite *prima facie* showing so as to fall within the crime or fraud exception to the attorney-client privilege. Plaintiff may inquire of Baker as to all facets of the alleged offer of a free beachfront lot to Lynch. The inroads upon the attorney-client privilege is limited to matters falling within the crime or fraud exception and does not constitute a *carte blanche* waiver of the entire attorney-client privilege. *See In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1041–42 (strictly limiting disclosure of information within the attorney-client privilege to matters falling within the crime or fraud exception).

## CONCLUSION

The Court has held plaintiffs have made a *prima facie* showing sufficient to invoke the crime or fraud exception to the attorney-client privilege. That is all that has been decided. Some of the deposition testimony cannot be reconciled, nor, at this stage, would it be appropriate to attempt to do so. The irreconcilable testimony graphically illustrates that at this point one cannot state with absolute certainty what actually occurred, other than there may have been discussions between Baker and Capano about offering a free beachfront lot to Lynch. It would be unfair for the casual reader to evaluate hastily anyone's conduct. For example, there is testimony that Lynch did not take the offer seriously. Also, there is no record evidence Lynch agreed to accept a free beachfront lot from any of the principals in exchange for preferential treatment for Capano in the purchase of the North Bethany Beach property.

An order will be entered granting the motion by plaintiffs to have an amendment to their complaint relate back to the time the complaint was filed. Also, the order

will grant plaintiffs' Third Motion to Compel.