**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: April 27, 2018
Date Decided: May 7, 2018

Stuart M. Grant, Esquire
Michael J. Barry, Esquire
Michael T. Manuel, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801

Robert S. Saunders, Esquire
Ronald N. Brown, III, Esquire
Skadden, Arps, Slate, Meagher
& Flom LLP
920 North King Street
One Rodney Square
Wilmington, DE 19899

Peter B. Andrews, Esquire
Craig J. Springer, Esquire
Andrews & Springer LLC
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807

Re: *Paul Morris v. Spectra Energy Partners (DE) GP, LP et al.*, Civil
Action No. 12110-VCG

Dear Counsel:

The following Letter Opinion (as is generally true of letter opinions) is written for benefit of the parties, with the understanding that it will have little interest for those uninvolved in the litigation. To those readers so uninvolved, I paraphrase the philosopher Finn: you won't know about this case without you have read my Memorandum Opinion denying in part a motion to dismiss,[1] but that ain't no matter.[2]

---

[1] *Morris v. Spectra Energy Partners (DE) GP, LP*, 2017 WL 2774559 (Del. Ch. June 27, 2017).
[2] Mark Twain, *The Adventures of Huckleberry Finn* 1 (Harper & Brothers 1918) (1885).

I do not intend to repeat the weary complex of facts necessary to the understanding of this master limited partnership ("MLP") dispute, to inform the following resolution of a sub-dispute regarding discovery obligations. Sufficient to understand the discovery issue is that a transfer of certain assets of the MLP, by the general partner to its principal, is constrained by the general partner's duty to act in good faith with respect to the transaction; that the Complaint alleges lack of good faith; and that the dispute is over two redacted documents to which I find the attorney-client privilege attaches, and that are relevant to the good-faith issue. I agreed to review the documents *in camera*. They include emails between counsel for the general partner's Conflicts Committee,[3] on the one hand, and the members of that Committee and its financial advisor, on the other.

I conclude that the redacted portions of the documents in dispute are not subject to discovery.[4] My rationale follows.

---

[3] Capitalized terms not defined here have the same meaning as in my June 27 Memorandum Opinion.

[4] Because of my decision here, I need not decide whether the identification of the documents by the Plaintiff, following inadvertent disclosure and a clawback, violated the confidentiality order in this case.

# I. DOES THE PRIVILEGE APPLY?

The attorney-client privilege promotes justice by encouraging candor between clients and their attorneys.[5] The privilege is codified in Delaware Rule of Evidence 502(b), which provides that

> [a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.[6]

The attorney-client privilege is critical to "the proper administration of justice," but it is not absolute.[7] There are several exceptions to the privilege, some of which are codified in Delaware Rule of Evidence 502(d).[8] "The burden of proving that the [attorney-client] privilege applies to a particular communication is on the party asserting the privilege."[9]

---

[5] *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1278 (Del. 2014); *accord Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993) ("The attorney-client privilege is intended to encourage full and frank communication between clients and their attorneys.").

[6] D.R.E. 502(b).

[7] *Salberg v. Genworth Fin., Inc.*, 2017 WL 3499807, at *3 (Del. Ch. July 27, 2017).

[8] *See* D.R.E. 502(d) (enumerating exceptions to the attorney-client privilege).

[9] *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992)

3

The attorney-client privilege protects legal advice only; it does not shield business advice.[10] Thus, "[a]n attorney performing a business function 'cannot avail himself of the protection associated with the attorney-client privilege.'"[11] Where business and legal advice cannot be separated in a given communication, "the communication will be considered privileged only if the legal aspects predominate."[12] On the other hand, where business and legal advice can be easily segregated, the communication "must be produced with the legal-related portions redacted."[13] And if "it is too difficult to determine if the legal issues predominate in a given communication," "the party asserting the privilege will be given the benefit of the doubt, and the communication will not be ordered produced."[14]

Having reviewed the two documents *in camera*, I find that the redacted portions contain communications protected by the attorney-client privilege. The documents include a series of emails between the Conflicts Committee's counsel, the members of the Committee, and the Committee's financial advisor.[15] The redacted portions of those emails reflect a combination of legal and business advice relating to a draft of the agreement that ultimately effectuated the transaction at issue

---

[10] *MPEG LA, L.L.C. v. Dell Global B.V.*, 2013 WL 6628782, at *2 (Del. Ch. Dec. 9, 2013).

[11] *In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 561 (Del. Ch. 2014) (quoting *Lee v. Engle*, 1995 WL 761222, at *3 (Del. Ch. Dec. 15, 1995)).

[12] *MPEG LA, L.L.C.*, 2013 WL 6628782, at *2.

[13] *Cephalon, Inc. v. Johns Hopkins Univ.*, 2009 WL 5103266, at *1 (Del. Ch. Dec. 4, 2009).

[14] *MPEG LA, L.L.C.*, 2013 WL 6628782, at *2.

[15] The documents also include emails between the Committee's counsel and counsel for SE Corp, though those emails are not redacted.

in this case. It is clear to me that the business and legal aspects of that advice cannot be separated. It is also clear to me that the legal component of the advice predominates over the business component. Thus, the redacted portions of the emails are protected by the attorney-client privilege.[16]

## II. DOES AN EXCEPTION TO THE PRIVILEGE APPLY?

Having found that the redacted portions of the emails are subject to the attorney-client privilege, I next address whether they nonetheless fall within an exception to the privilege. The Plaintiff argues that unredacted copies of the emails must be produced under the "at issue" and *Garner*[17] exceptions. In my view, neither of those exceptions applies here; thus, I decline to compel production.

### A. *The "At Issue" Exception*

The attorney-client privilege "can be waived when a party places an otherwise privileged communication 'at issue' in the litigation."[18] The at-issue exception applies where "(1) a party injects the privileged communications themselves into the litigation, or (2) a party injects an issue into the litigation, the truthful resolution of which requires an examination of confidential communications."[19] "Application of

---

[16] *See Sicpa Holdings, S.A. v. Optical Coating Lab., Inc.*, 1996 WL 636161, at *4 (Del. Ch. Oct. 10, 1996) ("Document B11 reflects communications made specifically between an attorney and a client. Moreover, based on an *in camera* review of the document, the primary purpose of the communications appears to have been to assist in the rendition of legal services (even if the communications also assisted the client in making a strategic business decision).").

[17] *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).

[18] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010).

[19] *Id.* (internal quotation marks and citation omitted).

the at-issue exception is guided by considerations of 'fairness and discouraging use of the attorney-client privilege as a litigation weapon.'"[20]  In the oft-repeated cliché, the exception "recognizes that a party cannot use the attorney-client privilege as both a 'shield' from discovery and a 'sword' in litigation."[21]  Nevertheless, a defendant does not waive the privilege simply by denying a plaintiff's allegations.[22]

Here, the Plaintiff does not argue that SEP GP injected the privileged communications themselves into the litigation.  Instead, the Plaintiff claims that SEP GP put at issue whether the Conflicts Committee in fact viewed "Reduced GP Cash Flow"/"IDR Reduction" as consideration.  But that is incorrect.  It was the Plaintiff who raised this issue.  The crux of the Complaint is that the Committee acted in bad faith by knowingly approving a transfer of SEP assets to SE Corp for approximately $500 million less than they were actually worth.[23]  The Committee's financial advisor initially valued the consideration to be received by SEP at $1.46 billion,

---

[20] *Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *6 (Del. Ch. Aug. 5, 2009) (quoting *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992)).

[21] *In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *2 (Del. Ch. July 3, 2013).

[22] *See Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987) ("To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case. Most often, this occurs through the use of an affirmative defense."); *see also* Paul R. Rice, *Attorney-Client Privilege in the United States* § 9:52 (2017) ("Under the [dominant] approach [to the at-issue exception], the client must inject a new issue into the case before his allegations will be construed as waiving the attorney-client privilege for communications that are relevant to the issue. *Only if the substance of the opposing party's claim has not already raised the same issue will the client's position jeopardize his privilege protections*." (emphasis added) (footnote omitted)).

[23] Compl. ¶¶ 1–4.

6

$575 million of which would come from "Reduced GP Cash Flow."[24] The problem was that, according to the Complaint, "'Reduced GP Cash Flow' . . . is *not* an element of consideration that was to be received by SEP in exchange for transferring the . . . assets to SE Corp."[25] Perhaps recognizing this reality, the Committee's financial advisor switched gears, excluding "Reduced GP Cash Flow" from its final presentation and estimating in its fairness opinion that SEP would receive only $946 million in the transaction.[26] The Committee purportedly knew, however, that the assets SEP was giving up would be valued at $1.5 billion when SE Corp transferred them to DCP.[27] In my motion-to-dismiss opinion, I held that this half-a-billion dollar gap in consideration (and the Committee's apparent knowledge of that gap) raised a reasonable inference of bad faith.[28]

Thus, it was the Plaintiff, not SEP GP, who put at issue whether the Committee truly believed that "Reduced GP Cash Flow" constituted consideration. Indeed, the Complaint itself suggests that the Committee could not have viewed it

---

[24] *Id.* ¶ 41.

[25] *Id.* ¶ 42.

[26] *Id.* ¶¶ 44, 50–51. For purposes of this discussion, I consider only the allegations in the Complaint itself, and not the documents submitted by SEP GP in support of its motion to dismiss. *See Morris*, 2017 WL 2774559, at *6 ("While there is some apparent inconsistency between the Complaint and the briefing in this matter, it appears from the presentations incorporated by the Complaint that the Reduced GP Cash Flows were not included by Simmons, in its final presentation, in the value of the *consideration exchanged* from SE Corp to SEP, but continued to be counted as part of the *total value* of the deal to SEP.").

[27] Compl. ¶ 48.

[28] *Morris*, 2017 WL 2774559, at *16.

7

as such, in part because the Committee's financial advisor allegedly never mentioned "Reduced GP Cash Flow" as a component of value after its initial presentation. And if the Committee did not perceive half a billion dollars of value in "Reduced GP Cash Flow" as consideration, it may have acted in bad faith by agreeing to transfer assets it knew were worth far more than what SE Corp was giving up. To be sure, SEP GP addressed this issue in arguing for dismissal of the Complaint, but a defendant does not waive the attorney-client privilege simply by advancing arguments for dismissal that respond to allegations in a pleading.

The Plaintiff argues that this case is analogous to *JP Morgan Chase & Co. v. American Century Cos., Inc.*[29] Not so. In *JP Morgan*, American Century held an option to buy back shares from JP Morgan, a major investor in American Century.[30] Under the option agreement, the per share purchase price would be conclusively determined by an independent advisor.[31] JP Morgan had a contractual right to challenge the advisor's determination if it believed in good faith that the valuation was manifestly wrong.[32] American Century exercised its option right in July 2011, when it was in the midst of arbitrating breach of contract claims against JP Morgan.[33] As it turned out, JP Morgan had already conceded liability in the arbitration, and in

---

[29] 2013 WL 1668393 (Del. Ch. Apr. 18, 2013).
[30] *Id.* at *1.
[31] *Id.*
[32] *Id.*
[33] *Id.*

8

August, American Century received about $373 million in damages.[34] JP Morgan alleged that American Century breached the implied covenant of good faith and fair dealing by failing to disclose to the independent advisor the value of its pending arbitration claims against JP Morgan.[35] According to JP Morgan, if the independent advisor had known American Century's arbitration claims were worth hundreds of millions of dollars, it would have incorporated that information into its valuation of American Century's share price.[36]

American Century sought discovery relating to JP Morgan's calculation of its litigation reserve for the arbitration claims.[37] That information was relevant because, if JP Morgan had placed a very low value on the claims, American Century might not have been obligated to disclose its own calculations to the independent advisor.[38] The Court held that documents reflecting JP Morgan's litigation reserve calculations were privileged.[39] But it found that JP Morgan had waived the privilege by "inject[ing] the valuation issue into the litigation."[40] Specifically, having alleged that American Century should have disclosed its valuation, JP Morgan "could have

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.* at *2.
[38] *Id.* at *4.
[39] *Id.* at *3.
[40] *Id.* at *4.

9

reasonably foreseen that American Century would seek to expose JP Morgan's own beliefs as to the valuation of the arbitration claims as a defense."[41]

Here, by contrast, SEP GP did not raise the issue that led the Plaintiff to seek discovery regarding the Committee's beliefs about "Reduced GP Cash Flow." Instead, the Plaintiff is simply seeking discovery relevant to allegations he himself advanced in his Complaint. That does not give him *carte blanche* to invade the attorney-client privilege as to discovery material that bears on those allegations. Thus, *JP Morgan* does not help the Plaintiff, and the at-issue exception is inapplicable.

### B. The Garner *Exception*

The *Garner* exception is a judicially created doctrine founded on the recognition that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show 'good cause' why the privilege should not apply."[42] A corporation invokes the attorney-client privilege through its officers and directors; those individuals owe a duty as fiduciaries to the stockholders to exercise the privilege in the best interests of the corporation.[43] On the other hand,

---

[41] *Id.*

[42] *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 568 (Del. Ch. 1998) (quoting *Garner*, 430 F.2d at 1103–04).

[43] *Zirn*, 621 A.2d at 781.

10

"management has a legitimate concern that its confidential communications should be allowed to remain confidential."[44] Thus, the *Garner* exception balances "the privilege's purpose of encouraging open communication between counsel and client [against] . . . the right of a stockholder to understand what advice was given to fiduciaries who are charged with breaching their duties."[45] Our Supreme Court has described the *Garner* exception as "narrow, exacting, and intended to be very difficult to satisfy."[46]

*Garner* provides the following non-exhaustive list of factors a court may consider in deciding whether the exception should apply:

> [1] the number of shareholders and the percentage of stock they represent; [2] the bona fides of the shareholders; [3] the nature of the shareholders' claim and whether it is obviously colorable; [4] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6] whether the communication related to past or to prospective actions; [7] whether the communication is of advice concerning the litigation itself; [8] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; [9] the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.[47]

---

[44] *Metro. Bank & Trust Co. v. Dovenmuehle Mortg., Inc.*, 2001 WL 1671445, at *2 (Del. Ch. Dec. 20, 2001).

[45] *de Vries v. Diamante Del Mar, L.L.C.*, 2015 WL 3534073, at *4 (Del. Ch. June 3, 2015), *adopted by* 2015 WL 3902623 (Del. Ch. June 18, 2015).

[46] *Wal-Mart Stores, Inc.*, 95 A.3d at 1278.

[47] *Garner*, 430 F.2d at 1104.

*Garner* itself does not say that certain factors are more important than others, but Delaware courts have typically accorded "particular significance" to three.[48] "They are: (1) the colorability of the claim; (2) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and (3) the apparent necessity or desirability of shareholders having the information and availability of it from other sources."[49]

Here, the Plaintiff is a unitholder in a limited partnership, and he is pursuing a derivative action premised on an alleged breach of contract. The limited partnership agreement at issue expressly eliminates all fiduciary duties.[50] Nevertheless, the Plaintiff argues that *Garner* requires production of unredacted copies of the emails reviewed *in camera*. Thus, the Plaintiff's Motion raises an issue that has yet to be addressed by a written opinion in this state: does the *Garner*

---

[48] *Salberg*, 2017 WL 3499807, at *5 (quoting *In re Fuqua Indus. Inc.*, 2002 WL 991666, at *4 (Del. Ch. May 2, 2002)).

[49] *Id.* (internal quotation marks omitted).

[50] David Aff. Ex. 1, § 7.9(e) ("Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner or Assignee and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee."); *see also Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100–01 (Del. 2013) (noting that identical language in a limited partnership agreement eliminated common-law fiduciary duties).

exception apply to a limited partnership that has eliminated common-law fiduciary duties?[51]  In my view, the answer to that question is no.

At the outset, this Court has expressly held that the *Garner* exception "will not apply absent a fiduciary relationship."[52]  That is in line with how courts in other jurisdictions tend to approach *Garner*.  In most jurisdictions, courts will not apply the balancing test set out above unless they first determine that there is a fiduciary relationship between the party challenging the privilege and the party asserting it.[53]  The reason for this threshold requirement goes to the core of the *Garner* exception.  At bottom, *Garner* rests on the mutuality of interest that exists "when a fiduciary (such as a corporate director) seeks legal advice in connection with actions taken or

---

[51] I need not, and do not, comment here on the applicability of *Garner* to situations where the MLP unitholder or limited liability company member is seeking to vindicate fiduciary obligations.  I note, however, that this Court has applied *Garner* to limited partnerships, though those cases appear not to have involved partnership agreements that waived fiduciary duties.  *See Metro. Bank & Trust Co.*, 2001 WL 1671445, at *2–4 (finding that *Garner* "may allow a limited partner, under certain circumstances, to gain access to . . . otherwise privileged [communications]," but holding that the circumstances did not warrant application of the exception); *Gotham Partners v. Hallwood Realty*, 1999 WL 252377, at *3 (Del. Ch. Mar. 31, 1999) (declining to apply *Garner* for lack of good cause, but noting that "[t]he limited partners' access to legal counsel should be analyzed as the contingent right of a shareholder in a derivative suit to demand privileged documents from the company's board of directors"); *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 1999 WL 66528, at *2 & n.8 (Del. Ch. Jan. 26, 1999) (noting that *Garner* applies to limited partnerships, and that "[a]bsent a clear modification of the statutory and common law fiduciary rules, . . . it is entirely appropriate for the Court to import rules of law and notions of fairness from outside the limited partnership context").

[52] *Cont'l Ins. Co.*, 1999 WL 66528, at *5 & n.28 (collecting cases).

[53] *See* Note, *An Uncertain Privilege: Reexamining* Garner v. Wolfinbarger *and Its Effect on Attorney-Client Privilege*, 35 Cardozo L. Rev. 1217, 1232 (2014) ("The most popular reading of *Garner* employs a stratified analysis. Only after finding the existence of a common law or statutory fiduciary relationship between the party seeking discovery and the party attempting to invoke the attorney-client privilege do most courts then weigh the good cause requirements." (footnote omitted)).

13

contemplated in his role as a fiduciary."[54] "Because the director is obligated to act in the best interest of the corporation and its shareholders, there is a mutuality of interest among the director, the corporation, and the shareholders when such legal advice is sought."[55] Indeed, the stockholder is the ultimate beneficiary of legal advice sought by fiduciaries *qua* fiduciaries.[56] Thus, if the stockholder can demonstrate sufficient cause, she ought to be able to view communications reflecting that advice.[57]

Where there is no mutuality of interest between the parties, however, *Garner* does not apply.[58] It is true that *Garner* has been extended to situations far removed from stockholder derivative suits, including "actions by union members against union officers; an action by trust beneficiaries against the trust and its trustee; an action by an excess insurer against the primary insurer; [and] an action by creditors against a bankruptcy creditor's committee."[59] But in each of these situations, the court determined that a fiduciary relationship existed.[60] Such a relationship

---

[54] *In re Fuqua Indus., Inc.*, 2002 WL 991666, at *3; *accord In re Freeport-McMoRan Sulphur, Inc.*, 2005 WL 225040, at *2 (Del. Ch. Jan. 26, 2005) ("In order to succeed in their motion to compel [on the basis of *Garner*], the plaintiffs bear the burden of demonstrating . . . mutuality of interest.")

[55] *In re Fuqua Indus., Inc.*, 2002 WL 991666, at *3.

[56] *Id.*

[57] *Id.*

[58] *See, e.g.*, *Cont'l Ins. Co.*, 1999 WL 66528, at *2 (noting that *Garner* applies only "[i]f a litigant can first establish that a mutuality of interest existed between the parties").

[59] Rice, *supra*, § 8:24.

[60] *Id.*

established the requisite mutuality of interest between the party opposing the privilege and the party asserting it.[61] As one leading treatise puts it, "[t]he only prerequisite for the application of *Garner* is the existence of a fiduciary relationship between the parties in dispute."[62]

Here, as noted above, there is no fiduciary relationship between the parties. To the contrary, the limited partnership agreement is a contract, and it contains a provision that expressly disclaims common-law fiduciary duties. Thus, by investing in the MLP and becoming a unitholder, the Plaintiff entered into a purely contractual relationship.[63] The elimination of fiduciary duties from that relationship means the Plaintiff, and other unitholders, "can no longer hold the general partner to fiduciary standards of conduct, but instead must rely on the express language of the partnership agreement to sort out the rights and obligations among the general partner, the partnership, and the limited partner investors."[64] The litigants here are

---

[61] *Id.*

[62] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 7.02[c][3] (2016) (alteration in original) (citation omitted). Notably, courts often describe *Garner* as the "fiduciary duty exception." *See, e.g.*, *Oliver v. Boston Univ.*, 2004 WL 944319, at *2 (Del. Ch. Apr. 26, 2004) ("Under the so-called *fiduciary duty exception* to the attorney-client privilege, shareholders who enjoy a 'mutuality of interest' with corporate management may obtain access to the corporation's confidential communications with counsel upon a showing of 'good cause.'" (emphasis added)).

[63] *See, e.g.*, *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *19–20 (Del. Ch. June 20, 2014) (describing a limited partnership agreement that eliminated all fiduciary duties as creating "a purely contractual relationship"), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).

[64] *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017); *see also Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 2016 WL 912184, at *2 (Del. Mar. 10, 2016) ("[W]ith the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights.").

contractual counterparties. Given the absence of any fiduciary relationship between these parties, the mutuality of interest that underpins the *Garner* exception does not exist.[65] *Garner* is therefore inapplicable, and I decline to compel production of unredacted copies of the emails reviewed *in camera*.

To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III

---

[65] *Cf. Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 1996 WL 14448, at *6–7 (S.D.N.Y. Jan. 16, 1996) ("In those contracts that contain a disclaimer of fiduciary duty, the terms of the contract will govern and the attorney-client privilege will not permit discovery on the communications. . . . The [plaintiffs] having failed to show a fiduciary relationship between the parties, [they] cannot assert the exception to the privilege."); *In re Colocotronis Tanker Sec. Litig.*, 449 F. Supp. 828, 833 (S.D.N.Y. 1978) (declining to apply *Garner* because "the plaintiff banks entered into participation agreements with EABC in which rights and duties were clearly delineated and benefits clearly stated. The fact the EABC occupied a central position in these transactions and that EABC managed the loans whose profitability would inure to the benefit of the plaintiffs does not mean that these agreements established a special fiduciary or trust relationship. The indicia of such a situation are not present here. Rather, these agreements are arms-length contracts between relatively sophisticated financial institutions and do not establish fiduciary relationships such as exist between the management of a corporation and the corporation's shareholders or even its debenture holders" (citations omitted)).